STATE OF NORTH CAROLINA v. CLIFFORD DELANE DAVIS

No. 44

(Filed 4 November 1976)

1. **Constitutional Law § 30— two years between indictment and trial— delay caused by defendant — right to speedy trial not denied**
     Defendant was not denied his right to a speedy trial, though more than two years elapsed between the time of indictment and trial, since the delay, as determined by the trial court, was the result of a studied effort to avoid trial on the part of the defendant.

2. **Criminal Law § 89— corroborating evidence — minor discrepancies — evidence properly allowed**
     The trial court in a second degree rape case did not err in allowing a physician who examined the victim to relate the history he obtained from her at the time he examined her, since his testimony was in essence in harmony with that of the prosecuting witness, and discrepancy in minor details would not warrant a new trial.

3. **Criminal Law § 86— prior offenses by defendant — cross-examination proper**
     The trial court in a second degree rape prosecution did not err in allowing the district attorney to cross-examine defendant with respect to prior convictions for forcible trespass and assault with intent to commit rape, particularly since defendant first informed the judge and jury in his own direct examination of the convictions.

1

4. **Criminal Law § 102— district attorney's argument — characterizations of defendant**

   Argument of the district attorney in a second degree rape prosecution was supported by the evidence, and his characterizations of defendant were fully supported by defendant's own testimony.

5. **Criminal Law § 102— district attorney's jury argument — comment on defendant's credibility**

   The district attorney's statement to the jury that "the State would argue and contend to you that his [defendant's] testimony was nothing but the testimony of a pathological liar" did not amount to an expression of opinion that defendant was a liar but instead submitted defendant's credibility to the jury; moreover, defendant's failure to object to the argument at the time it was made constituted a waiver of his objection.

6. **Rape § 6— consent only issue — submission of lesser degrees of crime to jury improper**

   In a prosecution for rape when all the evidence tends to show a completed act of intercourse and the only issue is whether the act was with the prosecuting witness's consent or by force and against her will, it is not proper to submit to the jury the lesser offenses included within a charge of rape.

7. **Criminal Law §§ 114, 119— request for instructions — expression of opinion by court**

   The trial court in a second degree rape case properly refused to give the jury an instruction requested by defendant that "it is true, rape is a most detestable crime, and therefore ought severely and impartially to be punished; but it must be remembered that it is an accusation easy to be made and hard to be proved, and harder to be defended by the party accused, even though completely innocent," since such an instruction would have amounted to an expression of opinion in violation of G.S. 1-180.

8. **Criminal Law § 119— requested instruction not given verbatim — no error**

   In a prosecution for second degree rape, the trial court did not err in failing to use the exact language of defendant's requested special instructions on the presumption of innocence and reasonable doubt, and on the function and duties of the jurors, since the court gave the requested instruction in substance.

9. **Criminal Law § 119— motive for rape — requested instruction properly denied**

   The trial court in a second degree rape case properly refused to give defendant's requested instruction that "the jury is instructed that in its deliberations upon the question of the defendant's guilt or innocence, it may consider his lack of motive to commit the crime charged," since motive was not an element of the crime charged and was utterly immaterial in this case.

10. **Criminal Law § 117— evidence of rape victim's reputation — consideration for credibility**

    The trial court's instruction in a second degree rape case that the jury should consider the evidence with reference to the reputa-

State v. Davis

tion of the rape victim for one purpose only, that of the victim's credibility, did not, as defendant contended, withdraw a defense witness's testimony with reference to the victim's reputation from the jury's consideration on the question whether she had consented to have intercourse with defendant, since there was no real distinction between the issue of the victim's credibility and the issue of her consent.

11. **Criminal Law § 168— misstatement of evidence by judge — no correction before verdict by defendant —no prejudice**

   In a second degree rape prosecution, the trial court's misstatement of defendant's testimony as he recapitulated it for the jury was not prejudicial to defendant, particularly in light of the fact that defendant did not object to the misstatement before the verdict, and the judge instructed the jury to take their own recollection as to what the witnesses had said.

12. **Criminal Law § 119— indictment not evidence — request for instruction required**

   In the absence of a request, defendant was not entitled to an instruction that an indictment is not evidence.

13. **Rape § 3— indictment for common law rape — trial for second degree rape proper**

   The indictment upon which defendant was tried charged common law rape, and its language was clearly sufficient to embrace second degree rape as defined by G.S. 14-21. Though G.S. 14-21, the statute dividing rape into degrees, was enacted subsequent to the date of the offense alleged in this case, it was nevertheless applicable to defendant's trial since Chapter 749 of the Session Laws of 1975 (ratified on 24 June 1976—prior to defendant's trial) provided that G.S. 14-21 should apply in all trials for rape committed after 18 January 1973 and prior to the effective date of G.S. 14-21, the period during which the rape for which defendant was on trial allegedly occurred.

APPEAL by defendant under G.S. 7A-27 (a) from *Thornburg, J.,* 5 January 1976 Session of MECKLENBURG.

Defendant was tried upon a bill of indictment which charged that on 26 August 1973 he "did, unlawfully, wilfully and feloniously ravish and carnally know Susan E¹aine Kilmer, a female, by force and against her will." The solicitor prosecuted defendant for second-degree rape under G.S. 14-21 (1973) and ch. 749, § 1 (1975), N. C. Sess. Laws. Upon defendant's conviction of that crime the judgment of the court was that he be imprisoned in the State's prison for "the remainder of his natural life." From this sentence he appealed as a matter of right to the Supreme Court.

Prior to 1 October 1975 defendant was represented by privately employed counsel, Mr. William L. Stagg. Disagree-

State v. Davis

ments, which they were unable to resolve, developed. "For reasons sufficient to the court," Judge Snepp permitted Mr. Stagg to withdraw and, upon defendant's affidavit of indigency, he appointed Public Defender Michael S. Scofield as his counsel.

On 9 December 1975 the public defender filed a motion to dismiss the indictment upon allegations that defendant had been denied his Sixth Amendment rights to a speedy trial. The case was calendared for trial at the 17 December 1975 Session, but it was necessarily continued because of the illnss of both the public defender and the assistant district attorney assigned to the case. The motion to dismiss, however, was heard. At the hearing Mr. Scofield advised Judge Snepp that he had filed the motion without talking to defendant "in any depth"; and that after consulting with him and Mr. Stagg, he had learned that the trial had been delayed because of defendant's requests for postponement. Whereupon, Mr. Scofield withdrew the motion to dismiss and requested that defendant be allowed bail in "a nominal amount." The judge expressed the opinion that this case could have been disposed of long ago except for defendant's "maneuvering" and "studied effort to avoid trial" and fixed his bond at $30,000.00. Thereafter the trial was held at the first term in January.

Evidence for the State, summarized except when quoted, tended to show:

On 27 July 1973 Susan Elaine Kilmer, a physical therapist, moved to Charlotte from Atlanta, Georgia, where she had lived with her parents for 24 years. On 26 August 1973 she had been employed by Huntersville Hospital for about four weeks and was living alone in Apartment 27-A in Fountain Square Apartments on Eastway Drive. Her next door neighbor, in Apartment 27-B, was Mary Jamison Johnson.

On the night of August 25th, after ascertaining that both the front door and the sliding glass door in the back were locked, Miss Kilmer went to bed and to sleep about 10:30 p.m. During the early morning hours, while it was still dark, a noise awakened her. The only light in her bedoom came from a street light. Miss Kilmer saw a man standing just inside the open door, which she had closed before retiring. When he said something to her, which she did not understand, she inquired who he was and what he was doing there. He said he was the maintenance man and asked her what *she* was doing there. She replied,

State v. Davis

"I live here. What do you want?" He said, "Have you got any money?" She said, "Yes, do you want it?" He answered, "No, I want you."

At this point Miss Kilmer started screaming. The man crossed the room, put his hand across her face, pushed her back on the bed and told her to shut up. He then said he was not going to hurt her, rolled her over on her stomach and held her, face down, on the bed while he asked her a number of questions, all of which she answered. *Inter alia,* he inquired as to her name (she told him it was Susan), where she worked, her marital status, and if she had ever been raped before. During his entire time his hand was on her back, and she was unable to see his face. He asked her if she would consider it rape if he had intercourse with her and she said "Yes." He then rolled her over on her back, put a pillow over her face and had intercourse with her.

Miss Kilmer testified: "I did not physically resist this man in any way. I was scared. I believed if I struggled, he would kill me. He said something while he was on top of me. I couldn't hear what he said. He then moved the pillow a little bit and I could hear somebody ringing the doorbell. . . . He said that I had better stay where I was because he had a gun. . . .

"I could hear people downstairs by then. I heard them identify themselves as police officers. They said, 'Police officers. Is there anybody there?' I was still in my bed at this time. The man was halfway between the bed and the door. He got up and closed the door and left it cracked about four inches. He said, 'You tell them I'm with you.' I didn't say anything. Then I heard people coming up the stairs and they called out, 'This is the police. Is there anybody there'; and he said 'you're going to protect me, aren't you?' I said, 'No, I won't.' I started yelling for the police then. He opened the door and went out and there were police officers on the landing. The lights were turned on after that. That man is in the court room. His name is Clifford Davis.

"I did not know Clifford Davis at that time. I had not seen him before that night."

The police had come to Miss Kilmer's apartment in response to a call from Miss Johnson who had been awakened

sometime after 1:00 a.m. by Miss Kilmer's voice next door. Miss Johnson testified:

"Her voice was very loud and clear. It was very distinct, and I could tell that she was alarmed. She said, 'Who are you?' There was a pause and then I heard her say, 'What are you doing here?'; another pause, and then I heard her say, 'Well, I live here'; and after that, I heard three screams, just really blood-curdling screams. I was really scared at this point. After I heard the screams, I decided to call the police. I have a phone by my bed but I did not know if the person in Susan's apartment had heard me or would hear me, so I went into the hall to use my phone, closing my door so that the light in the hall could not be seen. I then called the operator and requested the police. She got the police department and I identified myself and where I lived; I told them that I had heard my neighbor. I said 'She lives alone and I just heard her scream, three screams.' I said, 'I'm really afraid something bad has happened to her and I wish you would come out here and check on her.' . . . The police arrived between two and five minutes after I called them. I pointed to the next door so they would know where the trouble was. I saw one of them knock on the door and they knocked again. One went around the back of the apartment. I heard a voice in Susan's apartment say 'Put your hands up against the wall.' I saw Clifford Davis as they brought him from Susan's apartment. I had not seen him before."

The testimony of Charlotte police officers, C. H. Parker and J. C. Stanton tended to show that they were directed to Miss Kilmer's apartment by Miss Johnson, who had been waiting for them; that they entered the apartment from the rear through the sliding glass door, which was open far enough for them to enter sideways. Finding no one downstairs they called several times, "Police officers, is anybody home?" Getting no response they went upstairs. As they approached the landing Officer Parker again announced the presence of police officers and inquired, "Is anybody here?" This time he "heard a voice, Miss Kilmer's voice say 'He's up here.' " At this point defendant stepped out of the bedroom and one of the officers informed him that "he was under arrest for suspected possible rape." Upon hearing this defendant stated, "Susan, tell them who I am." Officer Parker immediately asked Miss Kilmer if she knew defendant, and she replied that she had never seen him before. After telling defendant to turn around and place

his hands on the wall, Officer Parker handcuffed him and took him to the patrol car. Defendant had the odor of alcohol about his person.

At the patrol car Officer Parker reached into defendant's right front pocket, where he found change, keys and apparatus used with an acetylene torch. While he was examining these items, defendant attempted to escape by running away from the police car. The officers apprehended him in a very short distance, and he was taken to the police station. There defendant told Officer Thompson that he had met Miss Kilmer two years earlier at a party in the same apartment complex.

Thereafter, Miss Kilmer called her father in Atlanta. Officer Stanton then took her to the Charlotte Memorial Hospital, where she was examined by the chief resident gynecologist, Dr. Larry Craddock, at 6:30 a.m. on 26 August 1973. He testified to the presence of sperm in her vaginal canal and her statement to him that she had been raped.

Early in the evening of August 26th Miss Kilmer went to Miss Johnson's apartment and told her she "couldn't bear to stay by herself that night." Miss Johnson spent the night with her. Two or three weeks later Miss Kilmer moved from the Fountain Square Apartments. Miss Johnson also moved.

Defendant's testimony in his own behalf, summarized except when quoted, tended to show:

In 1965, in Johnston County, he was convicted of an assault with intent to commit rape, which occurred on 28 December 1964 (see State v. Clifford Delane Davis, 265 N.C. 720, 145 S.E. 2d 7 (1965)). After serving three years of the twelve to fifteen-year sentence imposed for this felony, defendant was paroled. In July 1969 he moved with his family to Charlotte. There, on 28 November 1971, he made a "forcible entry" into the Fountain Square Apartment occupied by Miss Paula Crotwell. This was in the same apartment complex in which Miss Kilmer was living in 1971. Defendant was familiar with these apartments and knew they had patio doors. Upon his conviction of this forcible entry in 1971 defendant received an active prison sentence of two years (G.S. 14-126), and he was returned to prison.

According to defendant, during the latter part of July or early August 1973, he was on work release. During the daytime

he was working on the renovation of the Playmate Club in Charlotte and spending the night back at the prison unit. However, every week he had a weekend pass. While working at the Club he was introduced to Miss Kilmer (whom he consistently referred to as Susan) by one Joe Johnson (now deceased), who was at the Club "quite a bit." Defendant and Joe were discussing sex, and Joe commented that he had had sexual intercourse with Susan on several occasions. Defendant "made a statement that he might like to go out with her." Thereafter in mid-August he saw her at a party and talked to her for about five minutes. The next time he saw her was during the early morning hours of 26 August 1973.

About 12:00 p.m. on August 25th, having procured her telephone number from Directory Assistance, defendant called Miss Kilmer and told her he'd like to come over. She said it was too late but, when he insisted, she gave him her address. He instructed her to leave the back door open and he'd be over in a few minutes. Upon arrival he found the back door unlocked, entered and went upstairs, where he found Miss Kilmer lying in bed nude. After he had been with her about thirty minutes they had intercourse by mutual consent, after which he slept until about 5:00 a.m. As he prepared to leave, Miss Kilmer went downstairs and discovered that he had let her cat out when he came in. She shouted up to him to "go down and look for her." He went out and searched unsuccessfully for the cat for about five to ten minutes. He then returned to tell her he could not find the cat.

When he came upstairs she had gone back to bed and loudly demanded, "Well, what are you doing back up here?" He replied, "Well, it's your cat. Why don't you go look for him yourself or help me look for him." When Miss Kilmer asked him to go back downstairs he told her he had to go home; that it was late and he'd been out too long; that her back door would not close but she would have to get the apartment complex maintenance man to fix it because he did not have time.

At this juncture the police arrived, came up the stairs and ordered defendant Davis to put his hands on the wall. When Officer Parker asked him if he lived there he said, "No," and turned to Miss Kilmer to say, "Susan, tell them who I am and what I'm doing here." After he had asked her several times to tell them who he was and she had said nothing, Officer Parker took him downstairs to the police car. Once outside he panicked

State v. Davis

at the thought that he was on work release and it would probably come out that he was running around on his wife; so he "took off, trying to run from what [he] did not know."

After defendant was apprehended Officer Larson, who had remained with the police vehicle, asked him if he "knew this girl." When he replied that her name was "Susan," the officer inquired what her full name was. To this query he answered, "Didn't Susan tell you what her name was?" The officer said, "I'm asking you." At this point defendant said he "began to think that maybe Susan didn't want them to know her name."

He denied that Miss Kilmer ever screamed while he was in her apartment; that he asked her if she had ever been raped before or if she would consider it rape if he had intercourse with her. He also denied telling Officer Thompson he had met Miss Kilmer two years earlier.

On redirect examination Miss Kilmer denied that she had ever attended a party in Charlotte prior to the night of 25 August 1973.

*Attorney General Rufus L. Edmisten and Special Deputy Attorney General Edwin M. Speas, Jr., for the State.*

*Michael S. Scofield, Public Defender and James Fitzgerald, Assistant Public Defender for defendant appellant.*

SHARP, Chief Justice.

In the record on appeal defendant sets out 11 assignments of error, which we will examine in the order the matters complained of occurred at the trial.

[1] We consider first the assignment that defendant was denied his constitutional right to a speedy trial in that "the delay of time from indictment to trial was excessive . . . and that the delay was the studied choice of the State." This assignment, which is based on no exceptions taken at the trial, is totally without merit.

Initially, defendant was represented by his privately employed counsel, Mr. William L. Stagg. Sometime (date not disclosed) after defendant was indicted for the rape of Miss Kilmer, he severely injured himself in an unsuccessful attempt to escape from the Statesville prison unit over a 15-foot wall. *Inter alia,* he broke both ankles. In consequence he was removed to the

State's prison in Raleigh where he underwent surgery. Thereafter defendant continuously requested Mr. Stagg to have his trial postponed. In August 1975 he was brought to Charlotte for trial. At that time he told the assistant district attorney that he wanted to have a foot operation at the prison hospital before his trial, and he represented to the prosecutor that he would plead guilty to "two reduced pleas" if the prosecutor would postpone his trial. Upon these representations defendant's case was again continued.

On 29 September 1975 defendant was again brought to Charlotte for trial. This time he requested a continuance in order to have a "post-operative examination from surgery in August" and until after his "prison system expires the 22nd." He also denied any intention of ever pleading guilty to any offense and told Judge Snepp that his "greatest fear right now is having to appear with Mr. Stagg." After listening to defendant, Judge Snepp said to him: "Don't worry, Mr. Stagg is not going to appear for you . . . Mr. Davis, you apparently have used every method possible to put off the fateful day of trial. . . . All right. I'm going to give you a lawyer." Thereupon, Judge Snepp ordered that the public defender, Mr. Scofield, be appointed to represent defendant and, over defendant's protest and renewed request for a continuance, directed that defendant be arraigned the following day. The order permitting Mr. Stagg to withdraw as defendant's counsel was signed on 1 October 1975.

On 9 December 1975, without prior consultation with defendant as to the motion and "solely on the basis of the indictment being two and a half years old," Mr. Scofield filed a motion to dismiss the action. As pointed out in the preliminary statement, the case was scheduled to be tried before Judge Snepp on 17 December 1975. However, on that day, Mr. Buckhalt, the assistant district attorney, was absent on account of illness, and Mr. Scofield—although present—was barely able to speak. He did, however, advise Judge Snepp, in open court and in the presence of defendant, that he was withdrawing his motion to dismiss for lack of a speedy trial because he had learned that defendant himself had requested the postponements of his trial. Judge Snepp responded, "I have seen, and from what I know about this case, what I believe to be a studied effort to avoid trial on the part of the defendant." Mr. Scofield informed the court that after being appointed counsel for defendant he required four to six weeks to prepare, but thereafter he had

informed the district attorney (whom he knew had sched-uling problems) that "as soon as [the district attorney] was ready to go they wanted to go." The case was tried during the week of 5 January 1976.

On the foregoing facts we find incomprehensible and un-supportable the contention that the judge, *ex mero motu,* should have dismissed the action. *State v. Harrell,* 281 N.C. 111, 187 S.E. 2d 789 (1972); *State v. Johnson,* 275 N.C. 264, 167 S.E. 2d 274 (1969).

[2] Two of defendant's assignments of error relate to the ad-mission of evidence. The first charges that the court erred in permitting Dr. Craddock to relate the history he obtained from Miss Kilmer at the time he examined her on 26 August 1974 in that the history "did not corroborate but conflicted with the prosecuting witness's testimony." This assignment is not sus-tained. We find in the record no conflict between Miss Kilmer's testimony and Dr. Craddock's account of what she told him at the time of his examination. His brief summary of the history she gave him was not, of course, in the words of her testimony. However, "in essence there was harmony. . . . Discrepancy in minor details does not warrant a new trial." *State v. Cox,* 272 N.C. 140, 141, 157 S.E. 2d 717, 718 (1967).

[3] The next assignment is that the court permitted the dis-trict attorney to improperly cross-examine defendant concern-ing his prior criminal record. Specfically the district attorney's question was: "After you were paroled [from the 12-15-year sentence for assault with intent to commit rape] you . . . broke into Paula Crotwell's apartment and attempted to have sexual relations with her at that time without her permission?" Mr. Scofield objected to the question but, before the court could rule, defendant had answered, "I did not." The judge then over-ruled the objection and thereafter, upon repeated questioning, defendant admitted that he had been "convicted of a misde-meanor, breaking into Paula Crotwell's apartment . . . a forci-ble entry" and that he had received a sentence for it. In the challenged cross-examination we perceive no error prejudicial to defendant. *See State v. Mack,* 282 N.C. 334, 193 S.E. 2d 71 (1972); *State v. Gainey,* 280 N.C. 366, 185 S.E. 2d 874 (1972). Indeed, defendant first informed the judge and jury in his own direct examination that he had previously been convicted of an assault with intent to commit rape and of forcible trespass. The State was within its rights in cross-examining him with respect

to these two convictions. *See* 1 Stansbury's North Carolina Evidence § 35 at 103 (Brandis rev. 1973).

[4] Defendant's third assignment of error is that the district attorney made irrelevant and inflammatory remarks in his argument to the jury which were not supported by the evidence. The arguments of the public defender and the district attorney are in the record, and we have read both with care. We find nothing in the solicitor's remarks which exceeded the bounds of legitimate argument. At no time did he "travel outside of the record" or inject into his argument facts of his own knowledge or other facts not included in the evidence. His characterizations of the defendant are fully supported by defendant's own testimony. *See State v. Wortham,* 287 N.C. 541, 215 S.E. 2d 131 (1975). Considering the character of defense counsel's argument and his attack upon the character and credibility of the prosecuting witness the district attorney's response should have come as no surprise to him. The response he received was justified. *See State v. McCall,* 289 N.C. 512, 223 S.E. 2d 303 (1976).

[5] Defendant has inserted in the record on appeal an exception to the district attorney's statement to the jury, "The State would argue and contend to you that his [defendant's] testimony was nothing but the testimony of a pathological liar." Defendant made no objection to this argument at the time it was made. The general rule is that if an objection to argument of counsel is not made at the time of the argument, so as to give the court an opportunity to correct the transgression, it is waived. *State v. Coffey,* 289 N.C. 431, 222 S.E. 2d 217 (1976) ; *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974). The circumstances of this case suggest no reason for making an exception.

This Court held in *State v. Miller,* 271 N.C. 646, 157 S.E. 2d 335 (1967) that, while it is improper for a lawyer to assert his opinion that a witness is lying, a lawyer may argue to the jury that they should not believe a witness. In *State v. Noell, supra,* we held that it was not improper for the solicitor, in discussing the testimony of the defendant's witness, to say to the jury, "I submit to you, that they have lied to you." The solicitor did not call the defense witnesses liars. In this case the district attorney also submitted defendant's credibility to the jury. Defendant's third assignment of error is overruled.

[6] Defendant's assignments of error 4, 5, 6, 7, 10, and 11 relate to the judge's charge. The fourth assignment is that the

judge failed to include in the list of permissible verdicts guilty of an assault with intent to commit rape and guilty of an assault on a female. The judge instructed the jury that it could return only one of two verdicts, guilty of second degree rape or not guilty. Since this Court's decision in *State v. Bryant,* 280 N.C. 551, 187 S.E. 2d 111 (1972), the rule has been in prosecutions for rape that when all the evidence tends to show a completed act of intercourse and the only issue is whether the act was with the prosecuting witness's consent or by force and against her will, it is not proper to submit to the jury lesser offenses included within a charge of rape. *State v. Vick,* 287 N.C. 37, 213 S.E. 2d 335 (1975); *State v. Arnold,* 284 N.C. 41, 199 S.E. 2d 423 (1973); *State v. Bynum* and *State v. Coley,* 282 N.C. 552, 193 S.E. 2d 725 (1973). Assignment No. 4 is overruled.

[7]  Assignment No. 5 is to the court's denial of the defendant's request that he give the jury the following special instruction:

"It is true, rape is a most detestable crime, and therefore ought severely and impartially to be punished; but it must be remembered that it is an accusation easy to be made and hard to be proved, and harder to be defended by the party accused, even though completely innocent." U. S. Gov't, *Manual for Courts-Martial* ¶ 199a (Rev. ed. 1969).

Such expressions are sometimes found in the opinions of an appellate court. See *State v. Williams,* 185 N.C. 685, 693, 116 S.E. 736, 740 (1923). However, it was never intended that a trial judge should use them in instructing the jurors, who would undoubtedly interpret such an instruction as an expression of the judge's opinion as to the particular case. See *State v. Oakes,* 249 N.C. 282, 285, 106 S.E. 2d 206, 208 (1958). Judge Thornburg correctly refused to give the requested instruction. To have done so would have been to violate G.S. 1-180, which prohibits the trial judge from expressing an opinion as to "whether a fact is fully or sufficiently proven." This proscription applies to the State's case as well as the defendant's.

[8]  The substance of defendant's assignment No. 6 is that the trial judge failed to use the exact language of defendant's requested special instructions on the presumption of innocence and reasonable doubt, and on the function and duties of the jurors. The well established rule with us is that if a request

is made for a specific instruction "which is correct in itself and supported by evidence, the trial judge, while not required to parrot the instructions 'or to become a mere judicial phonograph for recording the exact and identical words of counsel,' must charge the jury in substantial conformity to the prayer." *State v. Bailey,* 254 N.C. 380, 386, 119 S.E. 2d 165, 170 (1961) ; *State v. Henderson,* 206 N.C. 830, 175 S.E. 201 (1934).

Insofar as the requested instructions are correct statements of legal principles and applicable to this case, the record discloses that the court instructed the jury in substantial conformity therewith. He was not required to give them verbatim. *State v. Howard,* 274 N.C. 186, 162 S.E. 2d 495 (1968). We surmise that the learned judge declined to give the instructions as tendered because he thought defense counsel did "protest too much" and that in the repetitive statements of elementary legal principles, he perceived an overemphasis calculated to convey to the jury the impression that the court was trying to tell them to acquit defendant. He committed no error when he marked the request, "Tendered in apt time and rejected except as included in instructions given."

[9]   The trial judge correctly rejected the following requested instruction in its entirety: "The jury is instructed that in its deliberations upon the question of the defendant's guilt or innocence, it may consider his lack of motive to commit the crime charged." Motive, of course, is not an element of a crime, *State v. Burno,* 200 N.C. 267, 156 S.E. 781 (1931). When a man rapes a woman it is utterly immaterial whether his motive was to satisfy his passion, savor a sensation of power, or to debase and humiliate his victim. In some cases, the presence or absence of a motive may be of great probative value in determining whether the accused is guilty of the crime charged. *See State v. Wilcox,* 132 N.C. 1120, 44 S.E. 625 (1903) ; 22 C.J.S. *Criminal Law* § 31(1) (1961). In this case, however, there is no question as to the identity of the man who entered Miss Kilmer's home in the early morning hours of 26 August 1973. He admits he had sexual intercourse with her. The only issue was whether the act was with Miss Kilmer's consent. The requested instruction was entirely inappropriate and could have served only to confuse the jury. Assignment of error No. 6 is overruled.

[10]   Assignment No. 7 relates to the court's charge that the jury should consider the evidence with reference to the reputa-

tion of Miss Kilmer "for one purpose only"; that if they believed all or any part of this evidence and found it to bear upon Miss Kilmer's credibility, they could consider it, together with all the other facts and circumstances bearing upon her truthfulness in deciding whether to believe or disbelieve her testimony during the course of the trial.

The testimony to which the judge had reference was that of defense witness Marjorie Campbell and State's witness Carolyn DePuy. Ms. DePuy, head of the physical therapy department at Huntersville Hospital, testified: Miss Kilmer was "hired from Atlanta" in the summer of 1973 and "that was her first job." In August Ms. DePuy asked Miss Kilmer where she was spending her weekends and ascertained that she had gone home for the first three. Ms. DePuy said, "Susan was a very diligent worker. She was of good character."

Ms. Campbell, who was a nurse at Huntersville Hospital, testified that she knew Miss Kilmer "on sight" but was not acquainted with her personally; that she had met defendant several times while visiting a friend at the Huntersville Prison unit; and that defendant had always conducted himself as a gentleman in her presence. Ms. Campbell further testified that she knew defendant's reputation to be good but based on her conversations with Miss Kilmer's boyfriend and two patients, she has an opinion about Miss Kilmer's reputation and "that opinion" is bad.

Defendant contends that the instruction he challenges in Assignment No. 7 withdrew Ms. Campbell's testimony with reference to Miss Kilmer's reputation from the jury's consideration on the question whether she had consented to have intercourse with defendant. He argues that since consent was the crucial issue in his trial, this instruction was prejudicial error. He cites the rule which is stated in 1 Stansbury's North Carolina Evidence § 105 (Brandis rev. 1973) and *State v. Stegmann*, 286 N.C. 638, 647, 213 S.E. 2d 262, 270 (1975) : "[T]he character of the complainant in rape may, it seems, be shown as bearing upon the question of consent."

Character and reputation are, of course, two different things. As pointed out in Stansbury's North Carolina Evidence, *supra,* § 110, when character is offered as evidence of a person's conduct on a particular occasion, it may not be proven by the opinion of those who know him. "[T]he standard method,

and usually the only permissible method, of proving character is by *reputation*. By this is meant *community* reputation, *i. e.*, general reputation in the community in which the person in question resides. Mere rumor and gossip, or a divided opinion, or the opinion of a part of the community, or reputation among a particular group, is not admissible." Thus, whether Ms. Campbell had a good opinion or a bad opinion about Miss Kilmer's reputation, her opinion was not evidence tending to prove Miss Kilmer's character.

Further, as the attorney general points out in the State's brief, "In this case, where the credibility of the victim's testimony that she did not consent was the key to the State's case, there is no real distinction between the issue of the victim's credibility and the issue of her consent." On that issue of consent, the testimony of defendant and Miss Kilmer was in irreconcilable conflict. There was no middle ground; the jury had to believe one and disbelieve the other. The credibility of the two was the key. If the jury found Miss Kilmer to be a creditable witness and believed her testimony, they would necessarily find that she did not consent.

On the evidence the charge which defendant challenges in assignment No. 7 was neither erroneous nor prejudicial as applied to defendant. This assignment is overruled.

[11]   In assignment No. 10 defendant asserts that the judge misstated defendant's testimony as he recapitulated it for the jury. The judge told the jury that defendant had offered evidence tending to show that shortly after he awoke in Miss Kilmer's bedroom on the morning of 26 August 1973 "the police came in, and that Susan Elaine Kilmer told them that he had raped her." This statement by the judge was an inadvertence. It was not the defendant who testified that when the officers entered Miss Kilmer told them defendant had raped her. It was Officer C. H. Parker who testified that as he approached the landing and announced the presence of police officers, the first thing Miss Kilmer said, after telling them to come up, was that she had been raped.

Defendant concedes that he did not object to the misstatement before the verdict. He now contends, however, that it was "a statement of a material fact not shown in evidence" and so prejudicial as to entitle him to a new trial. We do not so hold. We have repeatedly held that an inadvertence in recapitulating

the evidence must be called to the attention of the court in time for correction and that an objection after verdict comes too late. *State v. Monk,* 291 N.C. 37, 229 S.E. 2d 163 (1976) ; *State v. McClain,* 282 N.C. 396, 193 S.E. 2d 113 (1972) ; *State v. Cornelius,* 265 N.C. 452, 144 S.E. 2d 203 (1965) ; *State v. Lambe,* 232 N.C. 570, 61 S.E. 2d 608 (1950). Further, the judge specifically instructed the jury "to take your own recollection as to what a witness has said or as to what any of the evidence in the case was. At this point I will give you my recollection of what a part of the evidence offered by the parties tends to show . . ."

Under the circumstances of this case we are convinced beyond a reasonable doubt that the judge's inadvertent misstatement did not influence the verdict. Assignment No. 10 is overruled.

[12]   In assignment No. 11 defendant asserts that "the court erred when it failed to instruct that an indictment is not evidence" and this "failure to so instruct allowed the jury to give undue weight to the grand jury's finding of an indictment." Defendant made no request for such an instruction; and, in the absence of a request, the judge was under no obligation to give it. The presumption is that the jurors were intelligent people, that they understood the charge on the presumption of innocence and that they were not under the misapprehension that the bill of indictment was evidence tending to show that defendant was guilty of the crime it charged. Defendant has cited no authority for the proposition for which he contends. This assignment is without merit and is overruled.

Finally, defendant contends "that the court erred in accepting the verdict of second degree rape because appellant had not been indicted for second degree rape." We treat this assignment of error as a motion in arrest of judgment and overrule it.

[13]   Defendant argues that the rape for which he was indicted on 5 November 1973 allegedly occurred on 26 August 1973; that Ch. 1201, N. C. Sess. Laws (1973), codified as G.S. 14-21 (Cum. Supp. 1975), which divided rape into first and second degree offenses did not become effective until 8 April 1974; and that therefore the crime for which he stands convicted did not exist on 26 August 1973.

The indictment upon which defendant was tried charged common law rape, and its language is clearly sufficient to em-

brace second degree rape as defined by G.S. 14-21. This statute did not redefine or reconstitute the crime of rape. It remains carnal knowledge of a woman forcibly and against her will. The General Assembly's only purpose in dividing rape into degrees was to reduce the mandatory sentence of death theretofore imposed upon all defendants convicted of rape to a term of years or life imprisonment in those cases in which the rape was not accompanied by serious injury or accomplished by the use or threatened use of a deadly weapon and the victim was 12 years of age or over. In *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975) ; *State v. Lampkins,* 286 N.C. 497, 212 S.E. 2d 106 (1975), this Court held that for all rapes committed prior to 18 April 1974 the punishment remained death. However, on 24 June 1975 the General Assembly ratified Chapter 749 of the Session Laws of 1975, Section 1 of which provides:

"The provisions of G.S. 14-21, as rewritten by Section 2 of Chapter 1201 of the Session Laws of 1973, shall apply in all trials hereafter conducted for rapes committed after January 18, 1973, and prior to April 8, 1974, the effective date of Chapter 1201, Session Laws of 1973."

Obviously the enactment of Chapter 749 of the Session Laws of 1975 prior to the time of defendant's trial inured to his benefit. The United States Supreme Court long ago declared the power of State legislatures to reduce the penalties imposed for previously defined crimes. *Rooney v. North Dakota,* 196 U.S. 319 (1905). *See Calder v. Bull,* 3 U.S. (3 Dall.) 386 (1798).

We have examined the entire record in this case with care commensurate with the gravity of the sentence from which defendant appeals. It shows that defendant has had a fair trial before a patient and painstaking judge.

No error.