FINESSE G. COUCH, Individually and as Administratrix of the Estate of Carnell Simmons Couch, Plaintiff v. PRIVATE DIAGNOSTIC CLINIC and DUKE UNIVERSITY, Defendants

No. COA97-1540

(Filed 4 May 1999)

**1. Trials— argument of counsel—veracity of witnesses—no prejudicial error**

There was no prejudicial error in a medical malpractice action where plaintiff's counsel argued that defense witnesses were lying. The only objection was to a reference which was not alone sufficiently prejudicial to entitle defendants to a new trial and, although the statements may have been improper and the court should have given a cautionary instruction, the statements were not of such gross impropriety as to entitle defendants to a new trial. Given the convincing evidence presented at trial supporting defendants' negligence, any effect on the jury's verdict was harmless.

**2. Agency— hospital and doctors—substantial evidence**

The trial court did not err in a medical malpractice action by denying defendant-Duke University's motion for JNOV on the issue of whether any of the treating physicians was an agent of Duke. Considering the evidence in the light most favorable to the nonmoving party, there was substantial evidence of the existence of an agency relationship.

**3. Trials— Rule 60 motion—excusable neglect—voluntary dismissal—willful act**

The trial court erred in a medical malpractice action by allowing plaintiff's counsel to reinstate the Private Diagnostic Clinic as a defendant on a Rule 60 motion following a voluntary dismissal based upon plaintiff's counsel's mistaken belief that an employer-employee relationship existed between all treating physicians and defendant-Duke. The voluntary dismissal was a carefully considered decision, a trial strategy, and thus constitutes a deliberate willful act precluding relief under Rule 60. The fact that the legal consequences of the action were misunderstood by plaintiff's attorney is not material.

Judge Walker concurring.

Judge Greene concurring in part and dissenting in part.

COUCH v. PRIVATE DIAGNOSTIC CLINIC

[133 N.C. App. 93 (1999)]

Appeal by defendants from judgment entered 3 March 1997 by Tillery, J., in Superior Court, Durham County. Heard in the Court of Appeals 22 September 1998.

*Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, by Maria P. Sperando and Keith A. Bishop, for plaintiff-appellee.*

*Maxwell, Freeman & Bowman, P.A., by James B. Maxwell, and Robinson Bradshaw & Hinson, P.A., by Everett J. Bowman, Lawrence C. Moore, III, and John M. Conley, for defendants-appellants.*

WYNN, Judge.

Defendants Duke University and the Private Diagnostic Clinic appeal from a jury determination that their medical practice negligence caused the death of ten-year-old Carnell Simmons Couch—son of plaintiff Finesse G. Couch.

Individually and as administratrix of Carnell's estate, Ms. Couch initiated this action against Duke, the Private Diagnostic Clinic, and Dr. Delbert R. Wigfall—an Assistant Professor of Pediatric and Acting Chief of the Division of Nephrology at Duke. She alleged that those medical providers negligently: (1) failed to examine, assess, and treat Carnell in an appropriate and timely manner and, (2) failed to appropriately diagnose the extent and urgency of Carnell's condition.

In her complaint, Ms. Couch characterized Duke as a private university operating a private hospital for the treatment of persons in need of medical care and attention and the Private Diagnostic Clinic as a professional organization of physicians who practice medicine at Duke. The complaint further alleged:

At all times relevant to this action Dr. Wigfall, the attending physician and all other physicians under his control, supervision and guidance who rendered treatment, were agents of Duke [and the Private Diagnostic Clinic] and that all acts and omissions of Dr. Wigfall and all other physicians rendering treatment . . . were performed within the scope of their agency as agents and representatives of Duke [and the Private Diagnostic Clinic].

Although defendants denied in their answer that Dr. Wigfall and all other physicians were acting within the course and scope of an agency relationship with Duke at the time they rendered treatment to

Carnell, they admitted that the Private Diagnostic Clinic is a professional organization of physicians who practice medicine at Duke. Moreover, defendants admitted that Dr. Wigfall is a member of the Private Diagnostic Clinic practicing at Duke "and as such is employed by [Duke] to carry out those duties."

The day following the commencement of trial on 6 January 1997, Ms. Couch "by and through her . . . attorney of record" filed a written "Notice of Voluntary Dismissal with Prejudice" against Dr. Wigfall and the Private Diagnostic Clinic. Five days into the trial after six witnesses had testified, Ms. Couch's counsel attempted to have it stipulated "that the doctors who read the x-rays, and who treated Carnell on the 4th through the 15th [of December], and before, were employees of . . . [Duke]."

Defendants' counsel responded that these physicians "were . . . partners in the Private Diagnostic Clinic, at Duke practicing medicine at the medical center." Further, he stated that the physicians were employed as professors or faculty members in the Department of Pediatrics at Duke. However, he would not stipulate that the physicians were employed by Duke "as treating physicians."

Concerned that she had prematurely dismissed the Private Diagnostic Clinic as a defendant, Ms. Couch's counsel orally moved under Rule 60(b) for relief from the judgment in order to reinstate the Private Diagnostic Clinic. In support of this motion, counsel explained that she thought that only Dr. Wigfall was an employee of Duke at the time they rendered treatment to Carnell. Ms. Couch's counsel admitted that "it was a mistake, it was an honest mistake that we made," based on the statements of defendants' counsel and the allegation in the answer, that these physicians were employees of Duke. At another point in the record, Ms. Couch's counsel told the trial court that she entered the dismissal "because I wanted to just have everything real clean and have one defendant."

Despite defendants' objection to Ms. Couch's motion, the trial court reinstated the Private Diagnostic Clinic as a defendant. In its written order allowing the reinstatement of the Private Diagnostic Clinic, the trial court found that in dismissing the Private Diagnostic Clinic, Ms. Couch's counsel "acted in the good faith belief that an employer-employee relationship between all treating physicians and [Duke]" existed. Additionally, it found that: (1) Duke and the Private Diagnostic Clinic had not been prejudiced and (2) "the plaintiff was not at fault . . . and played no role in her counsel's decision to remove

[the] Private Diagnostic Clinic as a named defendant." Therefore, the trial court concluded that "the belief of counsel relative to the admissions of [Duke] was an inadvertent mistake and the actions taken . . . were excusable neglect."

At trial, the evidence showed that on 4 December 1991, Ms. Couch brought Carnell, who previously had been diagnosed with nephrotic syndrome[1] with minimal change disease, to Duke's emergency room after he began experiencing symptoms including swelling, decreased urine output, and shortness of breath. After performing a number of tests on Carnell, including a chest x-ray, the medical personnel diagnosed his condition as a relapse of his nephrotic syndrome, treated him with several drugs, and discharged him to the care of his parents.

On 10 December 1991, Carnell was again brought to Duke's emergency room complaining of a shortness of breath, coughing, and vomiting. This time, however, he was admitted to the hospital and given numerous tests including chest x-rays and two electrocardiograms ("EKGs"). An initial x-ray on 10 December 1991 led to a diagnosis of pneumonia, but the second x-ray on 14 December 1991 was reported to reveal that his lung anomaly had begun to resolve.

Further, the first EKG on 13 December 1991 was characterized as "a very strange looking EKG" suggesting that this test be repeated. The second, however, was interpreted as normal. Thereafter, on 15 December 1991, Carnell was discharged from Duke.

While at home on 13 February 1992, Carnell died. An autopsy established the cause of death as *in situ* pulmonary artery thrombosis, meaning that one or more blood clots had developed and blocked the main artery leading from the heart to the lungs. Some of the blood clots were determined to be months old, while others were years old.

At the close of all of the evidence, Duke moved for a directed verdict on the grounds that there was insufficient evidence of negligence on its part. The Private Diagnostic Clinic's motion was based in part on the trial court reinstating it as a defendant. The trial court denied both motions.

---

1. Generally characterized, nephrotic syndrome is a condition in which the kidneys leak protein that would normally stay in the blood stream and as a result there is a tendency for fluid to accumulate abnormally within the body. The condition is further characterized by intervals of remission punctuated by flare-ups or swelling of the abdominal and genital areas, and associated discomfort.

COUCH v. PRIVATE DIAGNOSTIC CLINIC

[133 N.C. App. 93 (1999)]

Subsequently, the jury determined that the medical doctors who treated Carnell were agents of Duke and that Carnell's death was caused by the negligence of both the Private Diagnostic Clinic and Duke. Damages were assessed at $2,501,150.00. Defendants moved for judgment notwithstanding the verdict (JNOV) which the trial court denied.

On appeal, defendants contend that the trial court committed reversible error by: (1) permitting Ms. Couch's counsel to engage in a grossly improper jury argument during trial, (2) denying Duke's Motion for Judgment Notwithstanding the Verdict, and (3) allowing Ms. Couch's counsel to reinstate the Private Diagnostic Clinic as a defendant. We address each of these seriatim.

I.

[1] First, defendants assert that the trial court abused its discretion in allowing the jury argument of Ms. Couch's counsel which contained various references to the veracity of defense witnesses. Specifically, defendants point to counsel's comments that: (1) "There is nothing worse than a liar because you can't protect yourself from a liar. . . . [T]hese people, and all the doctors that they paraded in here who told you lie, after lie, after lie"; (2) "They lied to your face, blatantly. They didn't care. They tried to make fools of everybody in the courtroom"; (3) "In your face lies"; (4) " . . . they knew before they put their hands on the Bible that they were going to tell those lies and [Defendants' attorney] put them up anyway. That's heavy. That's a heavy accusation"; (5) "Well, I don't know what you call it but that's a lie. That's not even—that's not shading the truth . . . How is that not a lie? How is that not a lie?"; (6) "So you see, when I say a lie, okay, I want the record to reflect that I mean a lie"; (7) "Now let me ask you this, how do you think that they intend to get out from under all these lies?"; (8) "This is another blatant lie"; (9) "When they parade these witnesses in one after another and lied to your face. I mean, they were not even smooth about it."

It is well established in North Carolina that "[c]ounsel have wide latitude in making their arguments to the jury." *State v. Miller*, 271 N.C. 646, 659, 157 S.E.2d 335, 346 (1967). Further, the control of counsel's arguments "must be left largely to the discretion of the trial judge," *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979), because the trial judge

'sees what is done, and hears what is said. He is cognizant of all the surrounding circumstances, and is a better judge of the lati-

tude that ought to be allowed to counsel in the argument of any particular case.'

*State v. Thompson,* 278 N.C. 277, 283, 179 S.E.2d 315, 319 (1971) (quoting *State v. Barefoot,* 241 N.C. 650, 657, 86 S.E.2d 424, 429 (1955)). Therefore, "the appellate courts ordinarily will not review the exercise of the trial judge's discretion [regarding jury arguments] unless the impropriety of counsel's remarks is extreme and is clearly calculated to prejudice the jury in its deliberations." *Johnson,* 298 N.C. at 369, 259 S.E.2d at 761; *see also Thompson,* 278 N.C. at 283, 179 S.E.2d at 319 (stating "[i]t is only in extreme cases of the abuse of privilege by counsel, and when this is not checked by the court, and the jury is not properly cautioned, [the appellate courts] can intervene and grant a new trial." ).

"Jury argument, however, is not without limitations." *State v. Sanderson,* 336 N.C. 1, 15, 442 S.E.2d 33, 42 (1994). " 'The trial court has a duty, upon objection, to censor remarks not warranted by either the evidence or the law, or remarks calculated to mislead or prejudice the jury.' " *Id.* (quoting *State v. Britt,* 288 N.C. 699, 712, 220 S.E.2d 283, 291 (1975)). Moreover, " '[i]f the impropriety is gross it is proper for the court even in the absence of objection to correct the abuse *ex mero motu.*' " *Id.* (quoting *Britt, supra*).

Defendants in the case *sub judice* objected only to the first of these arguments which was: "There is nothing worse than a liar because you can't protect yourself from a liar. . . . [T]hese people, and all the doctors that they paraded in here who told you lie, after lie, after lie." This comment alone is not sufficiently prejudicial to entitle the defendants to a new trial. Therefore, we must determine whether counsel's other references to defense witnesses' veracity constituted gross improprieties entitling defendants to a new trial because of the court's failure to correct them *ex mero motu.*

In North Carolina, "[i]t is improper for a lawyer to assert his opinion that a witness is lying." *State v. Locklear,* 294 N.C. 210, 217, 241 S.E.2d 65, 70 (1978). However, the mere fact that counsel makes such an argument does not automatically establish that the argument is grossly improper so as to require a new trial when the trial court does not intervene *ex mero motu. See State v. Solomon,* 340 N.C. 212, 218-20, 456 S.E.2d 778, 782-84 (1995) (holding that the trial court did not abuse its discretion by failing to intervene *ex mero motu* to prevent closing argument by the prosecutor that the defendant lied during his testimony); *State v. Noell,* 284 N.C. 670, 696, 202 S.E.2d 750.

767 (1974) (holding that solicitor's statement during closing that defense witnesses have lied was merely a question which was submitted to the jury for its determination when it made its findings and returned its verdict), *vacated in part on other grounds*, 428 U.S. 902, 96 S.Ct. 3203, 49 L.Ed.2d 1205 (1976); *State v. Jordan*, 49 N.C. App. 561, 569, 272 S.E.2d 405, 410 (1980) (holding that prosecutor's statements regarding his opinion as to the truthfulness of a defense witness, considering the evidence against the defendant, did not reach the level of the grossly improper statements which would require the trial court to correct them *ex mero motu*).

In fact, the existence of overwhelming evidence supporting the jury's verdict notwithstanding improper characterizations regarding the veracity of witnesses' statements has been sufficient in some cases to prevent the imposition of a new trial. *See e.g. State v. Sexton*, 336 N.C. 321, 444 S.E.2d 879 (1994) (holding that statements to the jury made by the prosecutor asserting that a defense witness was lying was improper, but considering all the facts and circumstances revealed in the record which showed overwhelming evidence against the defendant, such statements did not constitute a prejudicial error); *Thompson*, 278 N.C. at 277, 179 S.E.2d at 315 (holding that solicitor's statements to the jury that the defense witnesses were lying were not sufficient to warrant a new trial in view of the overwhelming evidence of guilt against the defendant). Therefore, to determine whether counsel's argument in this case was grossly improper, we must examine the argument in the context in which it was given and in light of the factual circumstances to which it refers. *See State v. Ocasio*, 344 N.C. 568, 580, 476 S.E.2d 281, 288 (1996).

Here, several trial witnesses (including some of Duke's witnesses) testified that the x-rays on December 11th and 14th revealed an enlarged pulmonary trunk and pulmonary arteries. Nonetheless, Duke neither reported nor evaluated this diagnosis.

Further, one month prior to the filing of this suit, Dr. Chen, a Duke cardiopulmonary radiologist, along with three other Duke physicians wrote a published article concluding that at the time of the x-rays, Carnell more likely suffered from a blood clot rather than pneumonia. Additionally, there was other evidence presented that Carnell's lung difficulties were not related to pneumonia, but instead due to a blood clot.

Given the convincing evidence presented at trial supporting the defendants' negligence, we find that the jury argument had a harmless

effect, if any on the jury's verdict. Although these statements may have been improper to the extent that the trial court should have given a cautionary instruction, we are unable to conclude that they were of such gross impropriety to entitle the defendants to a new trial. *See State v. Vines*, 105 N.C. App. 147, 412 S.E.2d 156 (1992) (holding that the prosecutor's argument attacking the integrity of defense counsel was of such gross impropriety as to justify *ex mero motu* correction; however, in light of the strong and convincing case against the defendant we could not hold that the prosecutrix's improper comments were sufficiently prejudicial as to require a new trial). Thus, we reject defendants' first assignment of error.

## II.

**[2]** Next, Duke argues that the trial court erred in denying its motion for JNOV because there was no competent evidence that "any of the treating physicians alleged to have been negligent was an agent of Duke."

A motion for JNOV is treated as a renewal of the motion for directed verdict. *See Maintenance Equip. Co. v. Godley Builders*, 107 N.C. App. 343, 353, 420 S.E.2d 199, 204 (1992); N.C. Gen. Stat. § 1A-1, Rule 50(b)(1) (1990). Thus, a movant cannot assert grounds on a motion for JNOV that were not previously raised in the directed verdict motion. See *Lassiter v. English*, 126 N.C. App. 489, 492-93, 485 S.E.2d 840, 842 (1997) (holding that a party must have made a directed verdict motion at trial on the specific issue which is the basis of the JNOV).

Because Duke never asserted this agency argument as a grounds for its motion for directed verdict, it has no standing to raise this issue in its motion for JNOV. *See id.* However, we will address the merits of its argument on this point.

Preliminarily, it is noted that we do not read the Supreme Court's holding in the *Smith* case to mean that all physicians who practice medicine at the Duke Medical Center do so as agents of the Private Diagnostic Clinic. *See Smith v. Duke Univ.*, 219 N.C. 628, 14 S.E.2d 643 (1941) (physicians employed by Duke University, as professors, are not necessarily employees of Duke University at the time they render treatment to a patient at the university hospital). Instead, the relationship between the Private Diagnostic Clinic, Duke, and the physicians at the Medical Center is subject to change and must necessarily be determined based on the evidence presented in each case.

COUCH v. PRIVATE DIAGNOSTIC CLINIC

[133 N.C. App. 93 (1999)]

The trial court in deciding a JNOV motion must determine whether the evidence in the light most favorable to the non-moving party is sufficient to take the case to the jury. *See Norman Owen Trucking, Inc. v. Morkoski*, 131 N.C. App. 168, 506 S.E.2d 267, 270 (1998). "The motion should be denied if there is more than a scintilla of evidence supporting each element of the non-movant's claim." *Id.* (citing *Ace Chemical Corp. v. DSI Transports, Inc.*, 115 N.C.App. 237, 242, 446 S.E.2d 100, 103 (1994)). In other words, the motion should be denied if there exists substantial evidence or " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Cobb v. Reitter*, 105 N.C. App. 218, 220 , 412 S.E.2d 110, 111 (1992) (quoting *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980)).

Admittedly, the testimony in the subject case is somewhat conflicting as to the exact relationship between Duke and those persons employed as professors, who also treat patients (including the reading of x-rays) at the Medical Center. There is some testimony that would support the conclusion that all such persons are rendering treatment as agents of the Private Diagnostic Clinic, not Duke, but that conclusion is not mandated on this record.

As previously stated, Duke admitted in its answer that the Private Diagnostic Clinic is a professional organization of physicians who practice medicine at the Medical Center and that Dr. Wigfall is a member of the Private Diagnostic Clinic practicing at Duke "and as such is employed by [Duke] to carry out those duties."

Moreover, witness testimony at trial supports the existence of an agency relationship between Duke and some of the persons rendering treatment to Carnell, including those who evaluated his x-rays. For instance, Dr. Cindy Miller, who interpreted the 14 December 1991 x-ray, testified she was employed by Duke as an Assistant Professor of Pediatric Radiology and in that capacity, she assisted "the clinicians and residents in the interpretation of [x-rays]." Dr. Mark Kliewer testified that he was employed by Duke as an Associate Professor of Radiology in its Department of Pediatric Radiology and in that capacity, "read and interpret[ed] some x-rays" of Carnell which had been taken on 14 December 1991.

Dr. Catherine Wilfert-Katz testified that she was "employed by [the] Medical Center" and "associated with" the Private Diagnostic Clinic at the Medical Center. Dr. Wilfert further testified that "within the framework of the Medical Center," she serves "as a consult for

infectious disease problems," and in this capacity, she received a consultation request from Dr. Wigfall regarding Carnell.

Considering this evidence in the light most favorable to the Ms. Couch, the nonmoving party, we conclude that there was substantial evidence of the existence of an agency relationship between Duke and Carnell's treating physicians. Accordingly, the trial court did not err in denying Duke's motion for JNOV.

III.

**[3]** Finally, the Private Diagnostic Clinic contends that the trial court erred in allowing Ms. Couch to reinstate Private Diagnostic Clinic as a defendant, when her counsel, as a trial strategy, deliberately dismissed the Private Diagnostic Clinic as a defendant. We agree.

Rule 60(b)(1) of the North Carolina Rules of Civil Procedure provides that upon a proper showing, "a court may relieve a party or his legal representative from a final judgment, order, or proceeding . . . [because of a] [m]istake, inadvertence, surprise, or excusable neglect." N.C. Gen. Stat. § 1A-1, Rule 60 (b)(1) (1990). A voluntary dismissal with prejudice constitutes a final judgment within the meaning of this Rule. *See Carter v. Clowers*, 102 N.C. App. 247, 252-53, 401 S.E.2d 662, 665 (1991); *but see* Wright, Miller and Kane, *Federal Practice and Procedure: Civil 2d § 2858* (voluntary dismissal does not give rise to relief under Rule 60(b)).

Whether conduct constitutes "excusable neglect" presents a conclusion of law, fully reviewable on appeal. *See Jones-Onslow Land Co. v. Wooten*, 177 N.C. 248, 98 S.E. 706 (1919); *Thomas M. McInnis & Assoc., Inc. v. Hall*, 318 N.C. 421, 425, 349 S.E.2d 552, 555 (1986). If "excusable neglect" exists, it is within the discretion of the trial court to allow or deny the Rule 60(b)(1) motion and that decision will not be disturbed on appeal unless the trial court has abused its discretion. *See id.*

Although negligence and carelessness can support Rule 60(b)(1) relief, it is only when such neglect or carelessness is excusable. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 113 S.Ct. 1489 123 L. Ed.2d 74 (1993) (construing a federal statute using the term "excusable neglect"). The determination of whether a particular act of negligence or carelessness is "excusable" requires consideration of any relevant circumstance, including: (1) "the danger of prejudice to the adverse party"; (2) "the length of any delay caused by the neglect and its effect on the proceedings"; (3)

"the reason for the neglect, including whether it was within the reasonable control of the moving party"; and (4) "whether the moving party acted in good faith." *12 Moore's Federal Practice*, 3rd, § 60.41[1][a]; *see McInnis*, 318 N.C. at 425, 349 S.E.2d at 555.

Deliberate or willful conduct cannot constitute excusable neglect, *12 Moore's Federal Practice*, 3rd, § 60.41[1][c][ii], at 60-88, 60-89 (3d ed. 1998), nor does inadvertent conduct that does not demonstrate diligence, *Id.* at § 60.41[1][c][ii], at 60-89. Thus, mistakes of legal advice or mistakes of law are not within the contemplation of Rule 60(b)(1). *See Phifer v. Travellers' Ins. Co.*, 123 N.C. 405, 31 S.E. 715 (1898); *Engleson v. Burlington Northern R.R. Co.*, 972 F.2d 1038 (9th Cir. 1992); *Federal Practice and Procedure § 2858* ("ignorance of law" is not grounds for Rule 60(b) relief).

In this case, the trial court granted Rule 60(b)(1) relief on the basis that Ms. Couch's counsel's "inadvertent mistake" in dismissing the claim against the Private Diagnostic Clinic, constituted "excusable neglect."[2] Our review of the record reveals that the voluntary dismissal of the Private Diagnostic Clinic and Dr. Wigfall was a carefully considered decision, a trial strategy, and thus constitutes a deliberate willful act precluding relief under Rule 60 (b)(1). The fact that the legal consequences of the action were misunderstood by Ms. Couch's attorney is not material. *See Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 575 (10th Cir. 1996). In any event, if the dismissal were held to constitute neglect, it would not be "excusable" because (1) Duke never admitted (in its answer or otherwise) that Carnell's treating physicians were its agents for the purpose of rendering treatment; and (2) Ms. Couch had signed a hospital form wherein she acknowledged that the treating physicians were not acting as employees of Duke, but as independent contractors.

Furthermore, Ms. Couch's attorney should have been on notice of the pitfalls of proceeding against Duke based on a claim that its professors were Duke's agents at the time they were treating patients at the hospital. *See Smith*, supra, 219 N.C. at 628, 14 S.E.2d at 643. Therefore, the voluntary dismissal of the Private Diagnostic Clinic,

---

2. Historically, it has been the excusable neglect of the party, not the attorney, which justifies relief under Rule 60(b)(1). *See Kirby v. Asheville Contracting Co.*, 11 N.C. App. 128, 131, 180 S.E.2d 407, 409 (1971). Nonetheless, attorney neglect can also constitute grounds for relief under Rule 60 (b)(1), if the client has been diligent in communicating with his attorney and is not otherwise at fault. *See Norton v. Sawyer*, 30 N.C. App. 420, 424, 227 S.E.2d 148, 152 (1976); *Pioneer, supra*, 507 U.S. at 396, 123 L. Ed.2d at 90 (attorney negligence can constitute excusable neglect).

was not subject to being set aside under Rule 60(b)(1) and the trial court erred, as a matter of law, in reinstating the Private Diagnostic Clinic into the lawsuit.[3]

In summary, the granting of Ms. Couch's Rule 60 motion is reversed and judgment entered, against the Private Diagnostic Clinic pursuant to the jury verdict, is vacated. Because there was substantial evidence that Carnell's treating physicians were agents of Duke and these physicians were in fact negligent, the trial court's denial of Duke's motion for JNOV is affirmed.

Private Diagnostic Clinic—Reversed.

Duke—Affirmed.

Judge WALKER concurs in a separate opinion.

Judge GREENE concurs in part and dissents in a separate opinion.

Judge WALKER concurring.

My research indicates that the majority of cases to reach our appellate courts regarding arguments of counsel which referred to the veracity of witnesses were criminal cases. In most of these cases, our courts have held that counsel's arguments regarding a witness lying was not sufficiently prejudicial to warrant a new trial. I would decline to impose a standard more restrictive in civil cases than in criminal cases. While I express my concern that counsel's argument may have violated our Rules of Professional Conduct, our Supreme Court has stated that ethical transgressions by counsel do not always constitute "legal error" and "legal error" does not entitle a defendant to a new trial unless it is prejudicial. *State v. Sanders*, 303 N.C. 608,

---

3. This Court's holding in *Carter, supra*, 102 N.C. App. at 247, 401 S.E.2d at 662 does not require a different result. In that case, the attorney dismissed, with prejudice, his complaint against Clowers and Deeney. *Id.* The attorney had intended to dismiss Clowers with prejudice and Deeney without prejudice. In effect, the attorney never intended to dismiss the action against Deeney with prejudice. *Id.* The trial court found that the attorney had entered the Deeney dismissal by "mistake and inadvertence" and allowed an amendment of the notice of dismissal. *Id.*

By contrast, in the *case sub judice*, Ms. Couch's attorney intended to dismiss the claim against the Private Diagnostic Clinic and made that decision after some deliberation.

281 S.E.2d 7, *cert. denied*, 454 U.S. 973, 70 L. Ed. 2d 392 (1981). I agree the trial judge did not commit prejudicial error in overruling defendant's lone objection and in not intervening *ex mero motu* in the remainder of the argument.

Judge GREENE concurring in part and dissenting in part.

I believe Plaintiff's closing jury argument contained grossly improper comments, and therefore would grant Duke a new trial.

In jury argument, a lawyer is not to determine matters of credibility and announce that opinion to the jury, as that is the prerogative of the jury. *State v. Locklear*, 294 N.C. 210, 218, 241 S.E.2d 65, 70 (1978). Thus a lawyer's expression of her opinion to a jury that a witness is lying is a "step out of bounds" and the trial court is obliged to act *ex mero motu* and immediately "correct the transgression." *Id.*; *State v. Miller*, 271 N.C. 646, 659, 157 S.E.2d 335, 345 (1967) (improper for lawyer to assert his opinion that a witness is lying); *cf. State v. Noell*, 284 N.C. 670, 202 S.E.2d 750 (1974) (district attorney's argument that "I submit to you, that they have lied to you" was proper), *vacated on other grounds*, 428 U.S. 902, 49 L. Ed. 2d 1205 (1976); *State v. Davis*, 291 N.C. 1, 229 S.E.2d 285 (1976) (argument that "The State would argue and contend to you that [defendant's] testimony was nothing but the testimony of a pathological liar," was proper); *State v. Solomon*, 340 N.C. 212, 456 S.E.2d 778 (statement that defendant was "lying his head off" was not improper because witness had admitted on the stand that he had lied), *cert. denied*, 516 U.S. 996, 133 L. Ed. 2d 438 (1995); *State v. Tyler*, 346 N.C. 187, 485 S.E.2d 599 (statement that defendant put his "hand on the Bible and told about 35,000 whoppers" did not require trial court to intervene *ex mero motu* because comment does not "equate to the type of specific, objectionable language referring to defendant as a liar"), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 411 (1997).

In this case, Plaintiff's counsel repeatedly expressed her unequivocal opinion that various witnesses for defendants had lied on the witness stand. She even suggested that defendants' counsel knew they were going to lie before they were placed on the witness stand and "they put them up anyway. That's heavy. That's a heavy accusation." Indeed it is! These comments were grossly improper and the trial court erred in overruling defendants' objection to them. To the extent there was no objection, the trial court erred in not intervening to immediately and *ex mero motu* stop the argument. The magnitude

of this error entitles Duke to a new trial. *See Locklear*, 294 N.C. at 218, 241 S.E.2d at 70 (granting defendant a new trial).

I fully concur with the remainder of the majority's opinion.