STATE OF NORTH CAROLINA v. JERRY LEWIS FORD

No. 651A87

(Filed 3 November 1988)

1. **Criminal Law §§ 103, 99.3— defendant not allowed to demonstrate murder weapon—no error**

In a murder prosecution in which defendant relied on an accident defense, the trial judge did not express an opinion on defendant's character and credibility by refusing to allow defendant to use the murder weapon to demonstrate his testimony even though seven State's witnesses handled the weapon in the course of their testimony. Defendant had not forewarned the court that he would request use of the weapon to demonstrate his testimony, and, absent prior arrangements, courtroom security was a legitimate concern.

2. **Criminal Law § 102.6— murder—prosecutor's argument concerning absence of satellite shotgun wounds—no error**

      The prosecutor in a murder case could properly rebut defendant's accident defense by calling the jury's attention to defendant's failure to produce evidence of satellite wounds from the shotgun pellets where the only medical evidence presented established that the victim had approximately a two and one-half inch hole in the right side of her chest, there was no evidence of satellite wounds, and the absence of such evidence supports an inference that the victim was shot at close range.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) (1986) from the imposition of a sentence of life imprisonment upon his conviction of first degree murder before *Rousseau, J.,* at the 24 August 1987 Criminal Session of Superior Court, GUILFORD County. Heard in the Supreme Court 11 October 1988.

*Lacy H. Thornburg, Attorney General, by Doris J. Holton, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

Defendant was convicted of first degree murder and sentenced to life imprisonment. We find no error.

The State's evidence, in pertinent summary, showed the following:

The victim, defendant's estranged wife, was a member of the United States Army Reserve. On 13 September 1986, shortly after the victim had completed a weekend drill, defendant was observed in the reserve unit parking lot driving fast and "screeching" the tires on his car. He then parked near the victim and motioned or called for her to come to him. When the victim ignored him, defendant went to her and grabbed her by the collar. He released her upon the request of the owner of a van parked nearby.

Defendant then went to his car and pulled out a shotgun. The reserve unit members standing nearby scattered. Defendant followed the victim. When the victim turned around, defendant pointed the shotgun at her. She asked defendant not to shoot her. Defendant said to her: "I told you to come back," and "I told you I

was gonna [sic] get you[,] girl. I told you." Several witnesses then heard a gunshot. A witness heard someone say, "I told you I was gonna [sic] get you, didn't I."

Several people helped the victim to the ground. Defendant jumped in his car and drove rapidly and recklessly as he exited the parking lot. The victim died later that evening from a gunshot wound that entered her chest and abdomen.

Defendant's testimony tended to establish an accident defense. A few days before the shooting he had looked through a window and seen the victim, dressed in night clothes, embracing a man later known to him as John Cathcart. The victim refused to open the door in response to defendant's knock. Defendant broke out the windows of Cathcart's car, then left and called the victim on the telephone. Cathcart took the phone and threatened defendant.

Two weeks later defendant went to the reserve unit parking lot and told the victim "all I want to do is just talk to you." He told her "something like, 'God will make you pay for the way you treat me.'" She laughed at him, and he grabbed her. Defendant then looked around and saw people coming toward him, including Cathcart, who appeared to have a knife in his hand. Defendant went to his car and "got the gun out." He did not remember cocking it, and he "didn't never point the gun at" the victim. He was pointing the gun toward the ground and trying to collect himself when Sgt. James Foust, Jr., jumped out of a van and grabbed the gun. The gun went off, and defendant heard the victim scream. He then ran to his car and left.

Defendant read to the jury the following from a statement he made to law enforcement officers on the night of the shooting:

> . . . I didn't want her to get shot. I just wanted her to talk to me. I went out there to talk to her. She was standing with a group of people. I pulled her over to the front of the car. The man came up with a knife in his hand. I let her go. I went to my car and got my gun, . . . and a group of people got in a van. I went up to the van and a man grabbed my gun. . . . We wrestled with it — each other and the gun went off and shot her.

[1]   Defendant first contends that the trial court erred by refusing to allow him to use the weapon from which the fatal shot was fired to demonstrate his testimony. He argues that the court had allowed seven State's witnesses to handle the weapon in the course of their testimony, and that its subsequent refusal to treat him likewise constituted an impermissible expression of opinion on his character and credibility.

The trial court may not express an opinion in the presence of the jury on questions the jury must decide. N.C.G.S. § 15A-1222 (1988). The credibility of a witness is such a question. *See* 1 Brandis on North Carolina Evidence § 8 (1988). "It is immaterial how such opinion is expressed or implied, whether in the charge of the court, in the examination of a witness, in the rulings upon objections to evidence or in any other manner." *State v. Freeman*, 280 N.C. 622, 626-27, 187 S.E. 2d 59, 63 (1972) (decided under former N.C.G.S. § 1-180); *see also State v. Wilhelm*, 59 N.C. App. 298, 302, 296 S.E. 2d 664, 667 (1982), *disc. rev. denied*, 307 N.C. 702, 301 S.E. 2d 395 (1983) (decided under present N.C.G.S. § 15A-1222).

However, " 'in the absence of controlling statutory provisions or established rules, all matters relating to the orderly conduct of the trial[,] or which involve the proper administration of justice in the court, are within [the court's] discretion.' " *State v. Smith*, 320 N.C. 404, 415, 358 S.E. 2d 329, 335 (1987) (quoting *State v. Rhodes*, 290 N.C. 16, 23, 224 S.E. 2d 631, 635 (1976) ). *See also Shute v. Fisher*, 270 N.C. 247, 253, 154 S.E. 2d 75, 79 (1967). "[T]he power of the trial judge to maintain absolute control of his courtroom is essential to the maintenance of proper decorum and the effective administration of justice." *Roberson v. Roberson*, 40 N.C. App. 193, 194, 252 S.E. 2d 237, 238 (1979).

The orderly conduct of this trial included insuring, to the extent possible, the safety of those in the courtroom and the continued presence of the defendant. The trial court reasonably could have concluded that both might be jeopardized by placement of the weapon in defendant's hands during the course of trial. Defendant had not forewarned the court that he would request use of the weapon to demonstrate his testimony. He could have sought, *in limine* or on voir dire, to arrange conditions under which he could so use the weapon without raising substantial concern for courtroom security. He failed to do so, however; and ab-

sent such arrangements, courtroom security was a legitimate concern. Under these circumstances, we hold that the court acted well within its discretionary power to control the orderly conduct of the trial in not allowing defendant to handle the weapon in the course of his testimony, and that its ruling did not constitute an impermissible expression of opinion on defendant's character or credibility.

[2] Defendant further contends that the trial court erred in allowing the prosecutor to state the following in closing argument:

> The defendant tells you that Foust wrestled the gun away from him, but if it happened like the defendant said, and it was an accidental shot, and [the victim] was just over here (indicating) to the side, and he didn't have the gun right up to her, wouldn't there be satellite wounds from the shotgun pellets around this wound?

Defendant did not object to this argument at trial. The standard of review thus is "whether the statements amounted to such gross impropriety as to require the trial judge to act *ex mero motu*." *State v. Oliver*, 309 N.C. 326, 356, 307 S.E. 2d 304, 324 (1983). We perceive no impropriety in the argument.

Counsel may argue the facts in evidence and all reasonable inferences to be drawn therefrom. *State v. Britt*, 288 N.C. 699, 711, 220 S.E. 2d 283, 291 (1975). "It is permissible for the prosecutor to draw the jury's attention to the failure of the defendant to produce exculpatory testimony from witnesses available to defendant." *State v. Thompson*, 293 N.C. 713, 717, 239 S.E. 2d 465, 469 (1977).

The only medical evidence presented established that "the decedent had approximately a two and a half inch oblong hole in the right side of her chest" and "surgical interventions on her body." There was no evidence of satellite wounds. Such evidence would have tended to be exculpatory because it would have supported defendant's accident defense. The absence of such evidence, contrastingly, supports an inference that the victim was shot at close range. The prosecutor thus properly could rebut defendant's accident defense by calling the jury's attention to defendant's failure to produce such evidence. *State v. Thompson*,

293 N.C. at 717, 239 S.E. 2d at 469; *State v. Britt*, 288 N.C. at 711, 220 S.E. 2d at 291.

No error.