STATE OF NORTH CAROLINA v. KELVIN MAURICE SOLOMON

No. 233A93

(Filed 5 May 1995)

**1. Evidence and Witnesses §§ 601, 693 (NCI4th)—reading letters to jury—absence of authentication, offer of proof**

The trial court did not err by refusing to permit defendant to have a State's witness read into evidence the contents of three letters written on his behalf to defendant where there was no proper identification or authentication of the letters, and defendant made no offer of proof or other attempt to show the court what he was trying to do with regard to the contents of the letters.

**Am Jur 2d, Trial §§ 436 et seq.**

**2. Criminal Law § 445 (NCI4th)— argument that defendant lied in testimony—no impropriety**

The prosecutor did not improperly inject his own beliefs, personal opinions or knowledge by his jury argument that defendant lied during his testimony. Rather, the prosecutor's remarks were consistent with the facts in evidence from the defendant himself and reasonable inferences drawn therefrom. Assuming that the prosecutor's statements were improper, the impropriety was not so gross or excessive as to require the trial court to intervene *ex mero motu* since the prosecutor in effect argued that the jury

should reject defendant's testimony because his credibility, having been impeached, made his version of the events unbelievable.

**Am Jur 2d, Trial §§ 692 et seq.**

3. **Evidence and Witnesses § 2791 (NCI4th)— knowledge of oath—truthful testimony—questions excluded—no error**

The trial court did not err by refusing to permit defense counsel to ask a defense witness whether she knew she was under oath where, notwithstanding the rule that credibility is for the jury, the witness was ultimately allowed to testify that she told the truth. Nor did the trial court err by refusing to allow defense counsel to ask defendant whether he had accurately pointed out to the prosecutor all of the places in his pretrial statements that were untrue since the effect of the question was to ask defendant whether the remainder of his testimony was truthful, and the question of whether a witness told the truth was for the jury to decide.

**Am Jur 2d, Witnesses §§ 743 et seq.**

4. **Homicide § 255 (NCI4th)— first-degree murder—shooting victim numerous times—second-degree instruction not required—argument insufficient to show incapacity to deliberate**

The evidence in a first-degree murder prosecution did not require the trial court to instruct the jury on the lesser offense of second-degree murder where defendant's evidence tended to show that another person shot and killed the victim, and the State's evidence tended to show that defendant and the victim argued because the victim had cheated defendant in a drug deal, defendant shot the victim in the groin, and as the victim attempted to run away, defendant ran after him and shot him several more times at close range. Evidence that defendant and the victim argued, without more, is insufficient to show that defendant's anger was strong enough to disturb his ability to reason and that he was thus incapable of deliberating his actions.

**Am Jur 2d, Homicide §§ 482 et seq.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from judgment imposing a sentence of life imprisonment entered by Michael, J., at the 30 November 1992 Criminal Session of Superior

STATE v. SOLOMON

[340 N.C. 212 (1995)]

Court, Halifax County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 13 February 1995.

*Michael F. Easley, Attorney General, by Mary Jill Ledford, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Benjamin Sendor, Assistant Appellate Defender, for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 1 June 1992 for the first-degree murder of Jessie Smith. The defendant was tried noncapitally, and the jury found defendant guilty of first-degree murder on the theory of premeditation and deliberation. By judgment and commitment dated 3 December 1992, Judge Michael sentenced the defendant to a term of life imprisonment.

At trial, the State presented evidence tending to show that Jessie Smith bled to death on 9 April 1992 as a result of multiple shotgun wounds to the arms, chest, abdomen and legs. Dr. Louis Levy, Medical Examiner for Nash and Edgecombe Counties, performed an autopsy on the victim. Dr. Levy's examination revealed that the victim's left lung and the main artery coming out of the heart were totally destroyed. The victim also suffered soft tissue and bone injuries. Dr. Levy discovered the presence of birdshot, buckshot, and plastic and fiber wadding material from shotgun shells inside the victim's body.

The State's evidence established that Delvin and Terence Dickens were with the defendant when the victim was shot. In November 1992, in lieu of facing murder charges, the Dickens brothers pled guilty to being accessories after the fact to murder and agreed to testify truthfully against the defendant.

Delvin Dickens testified that on the evening of 9 April 1992, he and his brother, Terence Dickens, drove to Scotland Neck, North Carolina, to pick up Delvin's girlfriend. On the way, Delvin and Terence stopped in Enfield, North Carolina, to pick up the defendant. At some point after the defendant was picked up, the victim, Jessie Smith (also known as "Booger"), came to the car, talked to the defendant and then got in the car. After driving away, the defendant and the victim began to argue. The car stopped and Delvin asked them to get out of the car. At that time, Delvin noticed that the defendant had a pistol grip shotgun between his legs. Terence asked the defendant what was going on, and the defendant replied, "This

guy [Smith] stuck me up for twenty dollars worth of stuff." Delvin believed that the defendant was referring to "crack" cocaine.

According to Delvin, as the victim left the car, the defendant began shooting. The first shot hit the victim in his groin area. The victim tried to run or hop away, but the defendant ran after him and shot the victim again. The victim continued to run until the defendant shot him a third time, at which point the victim screamed, "I'm a dead man. I'm dead." The defendant again approached the victim and shot him a fourth time. Smith fell to one knee. As Smith stood up, the defendant shot him a fifth time. Smith fell and did not move again.

Terence Dickens, the brother of Delvin Dickens, similarly testified that on the evening of 9 April 1992, he received a telephone call from the defendant. The defendant asked Terence to drive him downtown to meet someone. When Terence and Delvin arrived at the defendant's residence, the defendant was carrying a green jacket. Terence testified that he noticed a gun in the coat. When asked why he had the gun, the defendant stated that he needed to go downtown to give the gun to someone named "Booger."

Terence and the defendant found "Booger," and "Booger" got into the car. Terence drove out toward the country, and at some point, the defendant told Terence where to stop the car. According to Terence, he and Delvin got out of the car and made the defendant and the victim get out of the car. Terence testified that Delvin asked the defendant "what was going on," and the defendant replied that Jessie Smith "had stuck him up for twenty dollars worth of drugs." The defendant then began shooting "Booger." The victim attempted to run away, but the defendant ran after him while continuing to shoot. Defendant shot the victim numerous times at "point-blank range."

The defendant then got back into the car and told the Dickens brothers to take him home. Upon arrival at the defendant's home, the defendant told the Dickens brothers "not to tell anyone about this."

I.

[1] In his first assignment of error, the defendant contends that the trial court erred by sustaining the State's objections to defense counsel's repeated efforts to cross-examine Delvin Dickens about letters written to the defendant on Dickens' behalf.

On direct examination, Delvin Dickens testified that at his request, other inmates wrote three letters to the defendant urging him

to admit to killing the victim in order to clear Dickens' own name. On cross-examination, Dickens testified that other inmates wrote the letters on his behalf, that he read the letters, and that he intended for the letters to be sent to the defendant. Without further questioning, defense counsel then asked Dickens to read the three letters in an attempt to introduce their contents into evidence. The State's objections to each attempt to read the letters into evidence were sustained.

The defendant argues that contrary to Delvin Dickens' testimony, the letters do not contain any statements urging the defendant to admit to shooting the victim. Instead, the letters clearly state that Dickens told the police he did not know who killed the victim; that Delvin, Terence and the defendant should refuse to testify against one another; and that they all faced severe punishment unless they cooperated to deceive the police. The defendant contends that the trial court erred by not allowing him to cross-examine Dickens about the letters. The defendant asserts the following five arguments in support of his position that he should have been allowed to read into evidence the contents of the letters: (1) the letters contained prior inconsistent statements; (2) the letters were admissible for purposes of impeachment as a specific instance of prior bad conduct; (3) the State opened the door to the testimony; (4) the letters demonstrated bias; and (5) the letters were admissible generally under N.C.G.S. § 8C-1, Rule 611(b).

The defendant correctly argues that he was entitled to cross-examine Delvin Dickens about the letters. However, it is clear that the defendant was not seeking to cross-examine Dickens about the letters, but rather, was seeking to have Dickens read each letter into evidence. Further, defendant failed to lay a proper foundation prior to asking Dickens to read the letters. There was no point of reference made to any specific statement in any of the three letters so that the witness could either admit or deny such statement. In fact, there was no foundation or question asked by defendant to establish that the three letters (defendant's Exhibits 1, 2 and 3) were the same letters referred to by the witness on direct examination. The witness was merely asked to "read the letter."

The record reflects that the following testimony was elicited after defense counsel handed the witness the letter marked defendant's Exhibit No. 3:

Q.   All right. Was this letter written while you were held in Halifax Jail?

**STATE v. SOLOMON**

[340 N.C. 212 (1995)]

A. Repeat the question, please.

Q. Was that letter written while you were in the Halifax Jail?

A. Yes, sir.

Q. Do you know about when it was written?

A. No. I really don't.

Q. It was written with your consent and at your direction. Is that right? But you didn't write it?

A. No. I didn't write it.

Q. Who is that addressed to up at the top?

A. Kelvin Solomon.

Q. All right. Read the letter that was written with your consent, with your name, with the intent to go to Kelvin Solomon, read what's marked Exhibit #3.

[State's objection sustained.]

Without query or any argument to the court or exception taken or proffer, and without continuing to cross-examine as to the letter marked defendant's Exhibit No. 3, the defendant's counsel merely continued his cross-examination with respect to the other two letters. The questioning set out above is representative of, and virtually identical to, the language preceding the State's objections to the defendant's attempts to have the witness read the remaining two letters to the jury.

In essence, the defendant contends, in all of his arguments on this issue, that he was not allowed to cross-examine a key prosecution witness, regarding statements the witness made on direct examination about some letters written on his behalf, simply because he was not allowed to read into evidence the entire contents of what we can only presume are the same letters. This is not the case, as the record reflects. Defendant was allowed to cross-examine the witness as to his testimony about "some letters," but he failed to extend this cross-examination sufficiently to allow the reading of the entire contents of these particular letters into evidence. A written statement is not admissible as evidence without proper identification or authentication. *State v. Artis*, 325 N.C. 278, 305, 384 S.E.2d 470, 485 (1989), *judgment vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604, *on remand*, 327 N.C. 470, 397 S.E.2d 223 (1990).

STATE v. SOLOMON

[340 N.C. 212 (1995)]

Additionally, as above noted, after the prosecutor's objections were sustained, the defendant made to the trial court no offer of proof or other attempt to show the court where he was going or what he was trying to do with regard to the contents of the letters. Absent such an offer of proof, coupled with the failure to lay a proper foundation for the introduction of the letters, there was no showing of relevance. Evidence not relevant is not admissible. N.C.G.S. § 8C-1, Rule 402 (1992). The trial court properly sustained each of the prosecutor's objections. We would note that for the same reasons as stated above, the letters were similarly not admissible through the defendant's own testimony. This assignment of error is overruled.

II.

[2] In his next assignment of error, the defendant contends that the trial court abused its discretion by failing to intervene *ex mero motu* to prevent closing argument by the prosecutor that the defendant lied during his testimony.

The prosecutor made the following arguments, to which defendant now takes exception:

Not only is he a murderer, but he's bold as brass cause [sic] he can be taken in, be advised of his rights, come in here under oath and get right up on that witness stand and deny that he understood what his rights were one minute and then turn around and admit that he did the next, and then start *lying his head off* about what happened in April of 1992. And then want this jury to believe him. *To come up with a cock and bull story* in December of 1992 and expect you to brush away everything that's been said and every untruth he's ever told like you're suppose to say, we'll [sic] *let's give him best one out of four.*

. . . .

. . . The thing about Kelvin Solomon is he has not dealt with the truth in so long that he's forgot what it is. And he wants you to forget what the truth is. He wants to boldly come in here *after giving what he says are three untruthful statements* and . . . pull the wool over your eyes.

(Emphasis added.)

Prosecutors are given wide latitude in the scope of their argument. *State v. Syriani*, 333 N.C. 350, 398, 428 S.E.2d 118, 144, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S.

——, 126 L. Ed. 2d 707 (1994). "Even so, counsel may not place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs and personal opinions not supported by the evidence." *State v. Johnson*, 298 N.C. 355, 368, 259 S.E.2d 752, 761 (1979). Counsel may, however, argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom. *Syriani*, 333 N.C. at 398, 428 S.E.2d at 144.

It is well established that control of counsel's arguments is left largely to the discretion of the trial judge. *Johnson*, 298 N.C. at 368, 259 S.E.2d at 761. When no objection is made at trial, as here, the prosecutor's argument is subject to limited appellate review for gross improprieties which make it plain that the trial court abused its discretion in failing to correct the prejudicial matters *ex mero motu*. *State v. Pinch*, 306 N.C. 1, 17, 292 S.E.2d 203, 218, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994). In order to determine whether the prosecutor's remarks are grossly improper, the remarks must be viewed in context and in light of the overall factual circumstances to which they referred. *Id.* at 24, 292 S.E.2d at 221.

The evidence tends to show that after his arrest, the defendant made three statements to law enforcement officers. As the record reflects below, the defendant repeatedly stated, on cross-examination, that he had lied when giving these previous statements:

Q. Mr. Solomon, once you were advised of your rights, you told Detective Tripp, and this was at 10:30 A.M. on the eleventh of April when you were picked up, you told Detective Tripp, "Terry, I don't know his last name, came and picked me up the other night." Isn't that what you told Detective Tripp?

A. Yes, but I lied too, on that statement.

. . . .

Q. You said in your statement you heard about five shots?

A. I lied on that.

. . . .

Q. You said in your statement it was a white four-door car. Isn't that right?

A. No, sir.

Q.  You didn't say that on your statement?

A.  I lied if I did.

    . . . .

Q.  And then the very next sentence after that and the last sentence on that statement is, "Then we went up 48 and that's when he shot the hell out of him."

A.  I lied on this statement.

On numerous other occasions, the defendant did not specifically state that he lied, but instead, when asked if he was telling the truth, answered, "No, sir." The defendant also testified at one point that he did not understand his *Miranda* rights. Later, he changed his answers and admitted that he did indeed understand those rights. At yet another point in his testimony, the defendant denied knowing what the phrase "stuck me up" meant before admitting that the phrase referred to someone being cheated on a drug deal. Clearly, in light of the defendant's own testimony, the prosecutor did not inject his own beliefs, personal opinions or knowledge into his jury argument. Rather, the prosecutor's remarks were consistent with the facts in evidence from the defendant himself and the reasonable inferences drawn therefrom.

Assuming *arguendo* that the statements which the defendant now complains of were improper, the impropriety was not so gross or excessive that we would conclude the trial court abused its discretion by failing to intervene *ex mero motu.* When read in context, the prosecutor's argument was no more than an argument that the jury should reject the defendant's testimony in that the defendant's credibility, having been impeached, made his version of the events unbelievable. A prosecutor may properly argue to the jury that it should not believe a witness. *State v. McKenna,* 289 N.C. 668, 687, 224 S.E.2d 537, 550, *death sentence vacated,* 429 U.S. 912, 50 L. Ed. 2d 278 (1976). This assignment of error is, accordingly, overruled.

III.

[3]  In his third assignment of error, the defendant contends that the trial court erred by sustaining the State's objections to the defendant's efforts to ask two defense witnesses if they were telling the truth.

Defense counsel argues that the defendant and Cassandra Morrow were both vulnerable on cross-examination: the defendant

because he had made prior inconsistent statements to the police, and Ms. Morrow because her status as the defendant's girlfriend and mother of his children might imply bias. To bolster each witness' credibility on redirect examination, defense counsel asked the defendant whether he had accurately pointed out to the prosecutor all the places in his prior statements that were untrue and asked Ms. Morrow whether she knew she was under oath. The State objected to each question. The defendant argues that the trial court erred when it sustained each objection. We disagree.

The question of whether a witness is telling the truth is a question of credibility and is a matter for the jury alone. *State v. Ford*, 323 N.C. 466, 469, 373 S.E.2d 420, 421 (1988). Recently, this Court held that a trial court correctly sustained the prosecutor's objection to the question, "Are you telling this jury the truth?" *State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995). Notwithstanding this principle, Ms. Morrow was ultimately allowed to testify that she told the truth. We find no merit to the defendant's argument with respect to Ms. Morrow as she was permitted to testify to more than that which was previously excluded by the trial court. Defense counsel's question to the defendant was no more than a means to ask the witness whether the remainder of his testimony, which he did not point out as being untrue, was truthful. Thus, pursuant to our ruling in *Skipper*, the question of whether this witness, who was affirmed to tell the truth, did in fact tell the truth in his testimony, was something for the jury to decide, not the witness. *Id.* This assignment of error is without merit.

IV.

[4] Defendant next contends that the trial court erred by denying his request to instruct the jury on second-degree murder as a lesser included offense of first-degree murder.

Murder in the first degree, the crime of which the defendant was convicted, is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Fisher*, 318 N.C. 512, 517, 350 S.E.2d 334, 337 (1986). Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation. *State v. Brown*, 300 N.C. 731, 735, 268 S.E.2d 201, 204 (1980). A defendant is entitled to have a lesser included offense submitted to the jury only when there is evidence to support that lesser included offense. *Id.* at 735-36, 268 S.E.2d at 204.

Here, evidence of the lesser included offense of second-degree murder is totally lacking. The defendant's defense and his evidence, if believed, tended to show that Delvin Dickens shot and killed the victim and that the defendant had no role in the killing. The State's evidence on the other hand tended to show that Terence and Delvin Dickens, at the defendant's request, drove the defendant, who was armed with a sawed-off shotgun, to Enfield, North Carolina, to search for Jessie Smith, the victim. After finding Smith, the four men drove out toward the country. At some point, the defendant asked Terence Dickens to stop the car. The State's evidence further showed that the defendant and the victim were arguing because the victim had "stuck [the defendant] up," a term meaning he had cheated the defendant in a drug deal. The defendant then shot the victim in the groin. As the victim attempted to run away, the defendant ran after him and shot the victim several more times, all at close range. Neither the defendant's nor the State's view of the evidence tended to show a killing with malice but without premeditation and deliberation.

The defendant argues that the jury could have inferred that the defendant lacked the requisite element of "deliberation" based on evidence that the defendant and the victim were arguing prior to the shooting. Deliberation means that the defendant formed an intent to kill and carried out that intent in a cool state of blood, in furtherance of a fixed design for revenge or other unlawful purpose and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation. *State v. Faust*, 254 N.C. 101, 106-07, 118 S.E.2d 769, 772, *cert. denied*, 368 U.S. 851, 7 L. Ed. 2d 49 (1961). "The requirement of a 'cool state of blood' does not require that the defendant be calm or tranquil." *Fisher*, 318 N.C. at 517, 350 S.E.2d at 337. The fact that the defendant was angry or emotional at the time of the killing will not negate the element of deliberation unless such anger or emotion was strong enough to disturb the defendant's ability to reason. *Id.* Thus, evidence that the defendant and the victim argued, without more, is insufficient to show that the defendant's anger was strong enough to disturb his ability to reason. Without evidence showing that the defendant was incapable of deliberating his actions, the evidence could not support the lesser included offense of second-degree murder. We therefore conclude that the trial court correctly denied the defendant's request to submit the offense of second-degree murder to the jury. In this assignment, we find no error.

For the foregoing reasons, we conclude that the defendant received a fair trial, free of prejudicial error.

NO ERROR.