STATE OF NORTH CAROLINA
v.
MARION BEASLEY, JR.
No. COA07-1157
Court of Appeals of North Carolina
Filed July 1, 2008
This case not for publication
Attorney General Roy Cooper, by Special Deputy Attorney General Jill Ledford Cheek, for the State.
Nora Henry Hargrove, for defendant-appellant.
CALABRIA, Judge.
Marion Beasley, Jr. ("defendant") appeals from judgments entered upon jury verdicts finding him guilty of robbery with a dangerous weapon and first-degree murder in the perpetration of a felony. After invoking our discretion to grant certiorari and review the substance of this appeal, we find no prejudicial error.
The State presented evidence that on 15 July 1996, Mario Beasley ("Mario") who is defendant's brother and Mario's friend, Topaz Autery ("Topaz"), went to the Gregory Street Apartments ("the apartments") to meet defendant.
Mario possessed a black Chevrolet Corsica vehicle ("the Corsica") that did not function and was parked in front of the apartments. Mario and Topaz placed a shotgun into the back of theCorsica. As the three men stood in the parking lot of the apartments, a blue Nissan Pulsar vehicle ("the Nissan") entered the parking lot. Carlene McMahan ("Carlene"), a resident of the apartments, was expecting a visitor, Eleazar Velez Davila ("Eleazar"). Carlene approached the Nissan and spoke to Eleazar and his friend, Enrique Octaviono Pagoada Martinez ("Martinez"). Carlene told Eleazar and Martinez they could come inside her apartment, but when she walked towards her apartment, they did not follow her.
After Carlene walked away, Mario, Topaz, and defendant stood next to the driver's side of the Nissan, and then defendant walked to the passenger side of the Nissan and spoke to the passenger, Eleazar. Eleazar then reached into his back pocket and handed his wallet to defendant. Mario retrieved the shotgun from the Corsica, pointed the shotgun at the driver, Martinez, and told Martinez to hand him his money. Martinez did not acknowledge Mario. Topaz then told Mario to hand him the shotgun. With the shotgun in his possession, Topaz pointed the gun at Martinez, and told Martinez that he was not "bullshitting." Martinez told Topaz twice that Topaz will "have to shoot [him] first." Topaz subsequently shot Martinez in the chest causing Martinez to fall on his back. Mario threw Martinez's wallet on the ground behind the air conditioning unit and fled the scene along with the other two men. Defendant ran behind the apartments. Mario ran to his parents' house ("the house") and Topaz met him there. Detectives from the Winston-Salem Police Department arrived at the house, along with Mario's father. The detectives questioned Mario about the homicide that occurred at the apartments. After initially telling the detective he knew nothing, Mario later admitted knowing about the events that led to the homicide. Mario accompanied the detectives to the Public Safety Center where he identified defendant and Topaz as the other persons involved in the homicide. During the investigation, two wallets were recovered. Martinez's wallet was found beside the air conditioning unit and Eleazar's wallet was found on Albert Street.
Both Mario and defendant were charged with first-degree murder in the perpetration of a felony and robbery with a dangerous weapon of Martinez and Eleazar. Mario pled guilty to robbery with a dangerous weapon and entered an Alford plea to second-degree murder. His sentence was delayed until he testified truthfully at defendant's trial to the events that occurred on 15 July 1996.
At defendant's trial, Mario testified for the State. Defendant did not present any evidence. On 3 February 1998, in Forsyth County Superior Court, the jury returned a verdict finding defendant guilty of two counts of robbery with a dangerous weapon of Martinez and Eleazar. The jury also returned a guilty verdict for the first-degree murder of Martinez under the felony murder rule. On 5 February 1998, the Honorable Peter M. McHugh ("Judge McHugh") arrested defendant's conviction for the armed robbery of Martinez and imposed a life sentence without parole for defendant's conviction of first-degree murder of Martinez. Judge McHugh also sentenced defendant to a consecutive term of a minimum of 129 months to a maximum of 164 months in the North Carolina Department of Correction for defendant's conviction of the armed robbery of Eleazar. While defendant timely appealed the judgments to this Court, the appellate defender failed to perfect the appeal. On 6 March 2007, defendant filed a petition for writ of certiorari which was granted on 21 March 2007.
On appeal, defendant argues (I) he was deprived of his right to fully confront Mario's motive to tender a plea; (II) the trial court erred in sustaining the State's objection to defendant's closing argument; and (III) the trial court prevented defendant from thoroughly questioning Mario about the veracity of his prior inconsistent statements.

I. Mario's Motive To Tender A Plea
Defendant first argues the trial court deprived him of his right to fully confront Mario's motive to tender a plea and testify against him. Specifically, defendant argues that during his cross-examination of Mario, the trial judge sustained many of the State's objections to his questions regarding Mario's understanding of the plea agreement, as well as the consequences of his plea agreement, which prevented defendant from effectively confronting Mario's motive to tender a plea. Therefore, defendant argues the trial court's failure to allow defense counsel the opportunity to thoroughly question Mario's understanding of his plea agreement violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Sections 19 and 23 of the North Carolina Constitution.
"The Confrontation Clause guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him." State v. McNeil, 350 N.C. 657, 677, 518 S.E.2d 486, 498 (1999). "Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19 (1985) (per curiam). However, "the scope of cross-examination rests largely in the discretion of the trial court. Absent a showing of an abuse of discretion or that prejudicial error has resulted, the trial court's ruling will not be disturbed on review." State v. Maynard, 311 N.C. 1, 10, 316 S.E.2d 197, 202-03 (1984) (citations omitted), cert. denied, 469 U.S. 963, 83 L. Ed. 2d 299 (1984). "Cross-examination of an opposing witness for the purpose of showing his bias or interest is a substantial legal right. Jurors are to consider evidence of any prejudice in determining the witness' credibility." State v. Grant, 57 N.C. App. 589, 591, 291 S.E.2d 913, 915 (1982).
In State v. Prevatte, 346 N.C. 162, 484 S.E.2d 377 (1997), our Supreme Court held the trial court committed constitutional error by not allowing defense counsel to ask certain questions he proposed during the cross-examination of the State's principal witness. In Prevatte, the jury found defendant guilty, inter alia, of first-degree murder and the State's principal witness, JeffreyBurr ("Burr"), was an eyewitness to the shooting. Id. at 162-63, 484 S.E.2d at 378. At the time of trial, Burr "was under indictment in another county on nine charges of forgery and uttering forged checks." Id. at 163, 484 S.E.2d at 378. Defense counsel wanted to "cross-examine [Burr] about these charges and whether [Burr] had been promised or expected anything in regard to the charges in exchange for his testimony in [defendant's] case." Id. The trial court refused to allow defense counsel to ask Burr the proposed questions on cross-examination. Id. The Court held the State possessed a "strong[] weapon to control the witness" and that it was "constitutional error not to allow the questions on cross-examination that the defendant proposed" to ask Burr. Id. at 164, 484 S.E.2d at 378. In granting defendant a new trial, the Prevatte Court relied on the United States Supreme Court case, Davis v. Alaska, 415 U.S. 308, 39 L. Ed. 2d 347 (1974).
In Davis, the principal witness against defendant was on probation, and the court did not allow defendant to cross-examine the witness about his probationary status. Davis, 415 U.S. at 310-11, 39 L. Ed. 2d at 350-51. The Davis Court held the trial court's failure to allow defense counsel to question the witness about his probationary status violated the defendant's Sixth Amendment right "to be confronted with the witnesses against him." Id. at 315, 39 L. Ed. 2d at 353. Thus, in both Davis and Prevatte, the State exerted power over the witnesses because they were either presently facing charges or the loss of their probationary status. In the instant case, defense counsel's cross-examination of Mario went as follows:
Q: You were scared, [of the shooting] weren't you?
A: Yes.
Q: Scared you could get in some serious trouble for [the shooting].
A: Yes.
Q: And scared that you could end up being charged with murder.
A: Yes.
Q: And you knew armed robbery was a crime. Right?
A: Yes.
Q: Assault by pointing a gun was a crime.
A: Yes.
Q: And you knew you had acted with Topaz, you gave him the gun.
A: Yes.
Q: You even pointed it, right?
A: Yes.
Q: And you heard about the death penalty?
[State]: Objection.
The Court: Sustained.
. . . .
Q: And your understanding in answer to question number 12 [on Mario's plea transcript], the only thing you're admitting guilt to and accepting guilt for is robbery with a dangerous weapon, not to second degree murder. Is that right?
A: Yes.
[State]: Well, objection.
The Court: Objection sustained. Strike the question and strike the response.
. . . .
Q: What is your understanding of what an Alford plea is?
[State]: Objection.
The Court: Sustained.
. . . .
Q: What is your understanding of that Alford plea?
[State]: Objection.
The Court: Sustained.
Q: And it's your understanding that even after today, the State will have the option to make a motion to have the plea stricken. Is that correct?
[State]: Objection.
The Court: Sustained.
. . . .
Q: The fourth paragraph says  I beg your pardon. The third paragraph of the last page of the plea agreement says: As a condition of the plea is that [Mario] testify truthfully as best as he can remember the truth.
Is that correct?
A: Correct.
Q: Now, you realize that the State has the option, if they determine that you are not testifying truthfully, to move that this plea be stricken. Is that correct?
[State]: Objection.
The Court: Asked and answered.
A: That's correct.
Q: In your mind, do you understand  who do you understand the State to be, these folks over here. . . .
[State]: Objection.
The Court: Objection is sustained.
. . . .
Q: You're still scared, aren't you, about what's going to happen to you?
[State]: Objection.
The Court: Sustained.
Q: You testify today, are you concerned at all about what your sentence is going to be?
[State]: Objection.
The Court: Objection is sustained.
Here, as in Prevatte, Mario faced criminal charges and the State "had a strong[] weapon to control" Mario. Prevatte, 346 N.C. at 164, 484 S.E.2d at 378. With the State in a position of control, the defendant had a right to show that Mario was afraid the State would revoke his plea. More importantly, since the State could revoke his plea, the State had power over him. Id. at 163, 484 S.E.2d at 378. Thus, we conclude that the trial judge erred by failing to allow defendant to cross-examine Mario concerning his understanding of the plea and whether Mario knew that the State had the option to strike the plea agreement. While we conclude the trial court erred, this Court has held the violation may be harmless error. See, e.g., State v. Hoffman, 349 N.C. 167, 505 S.E.2d 80 (1998); State v. Reaves, 132 N.C. App. 615, 513 S.E.2d 562 (1999). We now determine whether this error was harmless beyond a reasonable doubt.
In the instant case, aside from Mario's testimony, the State presented substantial evidence of defendant's guilt. Three witnesses testified to the events that occurred on the date of the incident. Carlene and Shirley Wright ("Shirley") lived together in apartment number 12 of the apartments. Carlene testified that on the night of the incident, Eleazar visited her at her apartment earlier in the evening. Between 8:30 and 9:30 p.m., Eleazar called Carlene and asked if he could return to her apartment. Carlene agreed and Eleazar said a friend would drive him to Carlene's apartment. When Eleazar arrived, Carlene walked downstairs to meet him. The two men were in a Nissan, Eleazar as a passenger and Martinez as the driver. Carlene told Eleazar his friend, Martinez, could also stay in her apartment. As she turned to walk to her apartment, she did not hear the footsteps of Eleazar and Martinez following her. When she turned around, she observed three men, whom she recognized as Mario, Topaz, and defendant. Carlene knew defendant because she previously went out on a date with him. She also recognized Mario from seeing him in the neighborhood. She heard Mario say, "Oh yeah, you coming out the [sic] car." After hearing Mario make the statement, she witnessed defendant run around the back of the Nissan. Mario held a gun, which Carlene believed was a rifle, and she observed Mario hand the rifle to Topaz. After Carlene observed the rifle, she walked upstairs to join her friend, Shirley, who was standing on the balcony with a man named Ronald Williams ("Williams"). Carlene was scared and the three of them ran inside the apartment. Approximately five or six minutes later, Carlene heard a "blast."
Shirley testified that she and Williams were standing on the balcony in front of the apartment as Carlene walked towards the Nissan. She observed defendant walk from the Corsica and approach the passenger side of the Nissan. Shirley witnessed defendant talking to Eleazar, and then Eleazar handed his wallet to defendant. As defendant accepted Eleazar's wallet, Topaz stood on the driver's side of the vehicle holding a gun. After she observed Topaz holding the gun, she became scared, and she and Williams walked inside the apartment. After they walked inside the apartment, she heard "the gun."
Williams testified that on the night of the incident, he arrived at the apartments at approximately 9:30 p.m. to visit a friend. When he arrived at the parking lot, he observed Topaz, Mario, and defendant standing around a Corsica. He previously witnessed Mario driving the Corsica. He was able to see inside the Corsica, and saw a shotgun inside the vehicle. His friend was not home, so he went to Shirley's apartment, since Shirley and Carlene were home. Later, Shirley and Williams stood on the apartment's balcony, when Carlene left the apartment and approached the passenger side of the Nissan. After speaking to the passenger, Carlene walked upstairs to return to her apartment. Williams observed Topaz, Mario, and defendant standing beside the driver's side of the Nissan. Defendant then walked behind the Nissan and approached the passenger side of the Nissan. As he approached the passenger side, defendant "went through" the passenger's wallet. Mario stood on the driver's side of the vehicle, unarmed, and did not say anything. Topaz grabbed the gun out of the Corsica and pointed the gun at the driver. After Williams observed Topaz holding the gun, he walked inside Shirley's apartment. After a "couple of seconds" in the apartment, Williams heard a gunshot. He stepped outside the apartment and observed Topaz, Mario, and defendant running on Gregory Street away from the apartments.
After reviewing the testimony of the State's witnesses, we conclude the State presented substantial evidence to show defendantwas guilty of felony robbery with a dangerous weapon of both Martinez and Eleazar. The State also presented substantial evidence to show defendant was guilty of first-degree murder in the perpetration of a felony. Therefore, we conclude that although the trial court erred by not allowing defense counsel to cross-examine Mario regarding his understanding of the plea agreement, this error was harmless beyond a reasonable doubt. See Hoffman, supra. This assignment of error is overruled.

II. Defendant's Closing Argument
Defendant next argues that the trial court erred in sustaining the State's objection to a portion of defendant's closing argument. Specifically, defendant argues the trial court erred in sustaining the State's objection to defense counsel's statement that Mario is the only witness whose sentence depends on his testimony.
"The standard of review for improper closing arguments that provoke timely objection from opposing counsel is whether the trial court abused its discretion by failing to sustain the objection." State v. Jones, 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002). "The scope of jury arguments is left largely to the control and discretion of the trial court, and trial counsel will be granted wide latitude in the argument of hotly contested cases. Counsel are permitted to argue the evidence presented and all reasonable inferences which can be drawn therefrom." State v. Call, 349 N.C. 382, 419, 508 S.E.2d 496, 519 (1998) (citations omitted). "In order to assess whether a trial court has abused its discretion when deciding a particular matter, this Court must determine if theruling `could not have been the result of a reasoned decision.'" Jones, 355 N.C. at 131, 558 S.E.2d at 106 (quotation omitted). Furthermore, on appeal, "[t]o establish that a trial court's exercise of discretion is reversible error, a defendant `must show harmful prejudice as well as clear abuse of discretion.'" State v. Williams, 361 N.C. 78, 80, 637 S.E.2d 523, 525 (2006) (quoting State v. Goode, 300 N.C. 726, 729, 268 S.E.2d 82, 84 (1980)) (internal citations omitted).
In the instant case, in arguing the jury should reject Mario's testimony, defense counsel argued the following to the jury in her closing argument:
And what is Mario doing? Saving his skin. That's what he's doing. And I contend to you that Mario tells what he needs to tell to get himself out of trouble. The government needs to pin something on [defendant]  they got Mario up there to do it. He's got a deal, but after this is all over, he's going to be sentenced. And the government is going to recommend a sentence, and it's going to be based on [Mario's] performance on that stand. And I would contend to you that you ought to scrutinize that testimony more carefully than anybody's. And I contend to you, based on all of that, his testimony is not believable.
. . . .
And I'm not going to spend a whole lot more time on Mario except that he knows that his deal hinges on his incrimination of [defendant]. And again, we ask you to scrutinize that testimony with a fine tooth comb. And we contend that [Mario] is simply not believable.
. . . .
. . . Is it coincidental that Mario is the only state's witness who has the plea bargain and therefore consented to help the State convict. Mario is the only one that tells a different story. He's the only one whose sentence depends on his testimony 
[State]: Objection
[Defense Counsel]: He's the only one whose conviction hinges on that testimony.
The Court: Sustained.
The record reveals that defense counsel amply argued to the jury that Mario's "deal hinge[d]" on his testimony and that as a witness, Mario's "testimony is not believable." In addition, the trial court specifically instructed the jury regarding Mario's plea agreement with the State as follows:
During this trial, ladies and gentlemen, evidence was received which tends to show this[.] [T]he witness Mario . . . was testifying under an agreement with the prosecutor for a charge reduction in exchange for his testimony and that Mario . . . was testifying under an agreement with the prosecutor for a recommendation for a sentence concession in exchange for his testimony. If you find that Mario . . . did testify in whole or in part for these reasons, then you should examine his testimony with great care and caution in deciding whether or not to believe [Mario's testimony].
Therefore, the court's ruling did not impair defense counsel's opportunity to argue, as she did, that Mario has the potential to be a biased witness since he is the only witness for the State "whose conviction hinges on that testimony." Furthermore, assuming arguendo that the trial court abused its discretion, defendant was not prejudiced. After the State objected to a portion of defense counsel's closing argument, defense counsel rephrased her previous statement, arguing "[Mario's] the only one whose conviction hingeson that testimony." After defense counsel rephrased her statement, the court subsequently sustained the State's objection. Thus, the jury was allowed to hear defense counsel's argument after she rephrased her statement.
Therefore, we conclude defense counsel had the opportunity to argue to the jury that Mario served as a biased witness since his "conviction hinge[d]" on his testimony. As such, the trial judge did not abuse his discretion in sustaining the State's objection to a portion of defendant's closing argument. This assignment of error is overruled.

III. Mario's Prior Inconsistent Statements
Lastly, defendant argues that the trial court prevented the defendant from thoroughly cross-examining Mario about the veracity of his prior inconsistent statements. Therefore, defendant argues the trial judge violated the rules of evidence and also violated defendant's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.
Our standard for determining the bounds of permissible cross-examination is abuse of discretion. See State v. Warren, 347 N.C. 309, 317, 492 S.E.2d 609, 613 (1997) ("The trial court has broad discretion over the scope of cross-examination."). An abuse of discretion occurs "where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." State v. Hennis, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). In the instant case, defendant argues the trial court erred in sustaining the State's objections to the following cross-examination of Mario:
[Defense counsel]: And you told [police officers] that you didn't know what they were talking about. Is that correct?
[Mario]: That's correct.
[Defense counsel]: Told a lie.
[State]: Objection.
The Court: Sustained.
. . . .
[Defense counsel]: In any event, after you responded that you didn't know what [the police officers] were talking about, didn't they tell you that we knew you were there? Didn't they make a statement saying they knew you were there?
[Mario]: I don't remember.
[Defense counsel]: Possible, you don't recall?
[Mario]: I don't recall.
[Defense counsel]: And at that point, after [the police officers] asked you again what happened, you knew that your first line of not even being there didn't hold up, right?
[Mario]: Yes.
[Defense counsel]: You knew that wasn't going to work.
[Mario]: Yes.
[Defense counsel]: And you then  you know, kind of dawned on you at that point you couldn't get completely out of it.
[Mario]: Yes.
[Defense counsel]: So you tried to tell [the police officers] something else.
[State]: Objection.
The Court: Sustained.
[Defense counsel]: You then made another statement, didn't you.
[Mario]: Yes.
[Defense counsel]: This was kind of a second try to tell [Detective] Brown and [Detective] Cozart what happened.
[State]: Objection.
The Court: Sustained.
. . . .
[Defense counsel]: And you told [the detectives] that you didn't know how the shotgun got into the car, and that was a lie.
[State]: Objection.
The Court: Sustained.
[Defense counsel]: That wasn't the truth, was it, sir? You knew how the shotgun got in the car.
[State]: Objection.
The Court: Sustained.
[Defense counsel]: Did you know that you were telling [the detectives] something that was not in fact true?
[State]: Objection.
The Court: That is sustained.
[Defense counsel]: Do you recall telling [the detectives] that you did not know how the shotgun got in the car?
[Mario]: Yes.
[Defense counsel]: And now your testimony today on direct exam is that you do know.
[Mario]: Yes.
[Defense counsel]: So you've told two different stories or versions as it relates to this shotgun being in the car, right?
[State]: Objection.
The Court: Objection is sustained.
[Defense counsel]: Which one of those two versions that you've told regarding the shotgun being in the car was true?
[State]: Objection.
The Court: The objection is sustained.
[Defense counsel]: You told [the detectives] that Topaz pushed you out of the way, is that right?
[Mario]: Yes.
. . . .
[Defense counsel]: . . . So then when you told [the detectives] that, that wasn't true.
[State]: Objection.
The Court: Sustained.
. . . .
[Defense counsel]: And you told [the detectives] that you did not even come to the scene with . . . Topaz, correct?
[Mario]: Yes.
. . . .
[Defense counsel]: . . . Now, that statement you made to [the detectives], that was not true, was it 
[State]: Objection.
. . . .
The Court: [objection] is sustained.
[Defense counsel]: Why did you tell [the detectives] that statement that differs so markedly from today?
[State]: Objection.
The Court: Sustained.
[Defense counsel]: Were you trying to get out of it when you talked to [the detectives]?
[State]: Objection.
The Court: Sustained.
We note that defendant here does not argue that the trial court prevented defense counsel from cross-examining Mario about his prior inconsistent statements. Rather, defendant argues that he was prevented from asking Mario whether, by his making inconsistent statements, he had "lied" or been "untruthful." However, defendant's objections relate to the credibility of Mario as a witness. The issue of credibility is a matter for the jury to decide. See State v. Solomon, 340 N.C. 212, 221, 456 S.E.2d 778, 784 (1995), cert. denied, 516 U.S. 996, 133 L. Ed. 2d 438 (1995) ("The question of whether a witness is telling the truth is a question of credibility and is a matter for the jury alone."); State v. Chapman, 359 N.C. 328, 364, 611 S.E.2d 794, 821 (2005) ("Therefore, under our prior case law it is improper for defense counsel to ask a witness (who has already sworn an oath to tell the truth) whether he has in fact spoken the truth during his testimony.").
In the instant case, the record reflects that on direct examination, Mario testified that initially he had been untruthful when police officers questioned him at his parents' house regarding the incident. On cross-examination, defense counsel elicited from Mario that he had been untruthful to the police officers during questioning in several respects. Specifically, defense counsel elicited from Mario that he had initially falsely denied having knowledge of the crimes when the police officers questioned him at his parents' house; that he falsely told police detectives that he did not know how the shotgun appeared in his Corsica; that he falsely told police detectives that Topaz pushed him out of the way; and that he initially told police detectives that he did not arrive at the apartments' parking lot with Topaz. Thus, defense counsel sufficiently established that Mario initially told police officers untruthful statements.
However all of defendant's arguments on appeal relate to defense counsel questioning Mario regarding his "lies" or"untruths." These "questions" by defense counsel at trial constitute conclusions regarding the credibility of Mario as a witness and are "a matter for the jury alone." Solomon, 340 N.C. at 221, 456 S.E.2d at 784. Since defense counsel elicited from Mario that he was initially untruthful to police officers and defense counsel's questions at trial amounted to conclusions about the witness' credibility, a matter left to the jury, we determine the trial judge did not abuse his discretion in sustaining the State's objections. This assignment of error is overruled.
The record on appeal includes additional assignments of error not addressed by defendant in his brief to this Court. Pursuant to N.C.R. App. P. 28(b)(6) (2007), we deem them abandoned and need not address them.
No prejudicial error.
Judges WYNN and GEER concur.
Report per Rule 30(e).